3:10 MJ 7048

ATTACHMENT A

AFFIDAVIT

Affidavit in support of a Criminal Complaint against:

HOR I. AKL
AMERA A. AKL

I, JONATHAN P.R. JONES, Special Agent of the Federal Bureau of Investigation (FBI), United States Department of Justice, hereinafter referred to as your Affiant, being duly sworn on oath, hereby deposes and states:

INTRODUCTION AND QUALIFICATIONS

1. As a Special Agent (SA) of the FBI, your Affiant is an investigative or law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510 (7). Your Affiant is empowered to conduct investigations of and to make arrests for offenses enumerated in 18 U.S.C. § 2516.

2. Your Affiant has been a Special Agent (SA) of the Federal Bureau of Investigation (FBI) for over 3.5 years. Prior to joining the FBI, your Affiant served four years as an industrial engineer as a civilian employee with the U.S. Navy. With the FBI, your Affiant has been assigned responsibilities to investigate federal crimes involving fugitives, stolen property, bank robberies, drugs, gangs, counterfeiting, international threats against the United States, and other general criminal

offenses. For almost three years, your Affiant has been assigned to the Joint Terrorism Task Force (JTTF) where his primary duties have been to conduct investigations into terrorism and terrorism-related offenses. Your Affiant has also sought advice from FBI Special Agents with even more law enforcement experience on the subject of material support of terrorism and other matters.

Your Affiant has received hundreds of hours of various law enforcement, tactical and investigative training from the FBI, local and state law enforcement agencies, and private organizations (including on the job training).

Your Affiant's relevant experience as an FBI Special Agent arises from your Affiant having participated in numerous investigations involving terrorism, terror financing, and conspiracies to provide material support to terrorist groups. Your Affiant has experience in the handling of sources tasked with infiltrating terrorist cells, groups conspiring to aid terrorist groups, and organizations involved in related terrorist activities. Your Affiant has extensive experience in conducting surveillance, performing interviews of sources of information and targets of investigations, and executing search warrants; in total, your Affiant has participated in the execution of dozens of search warrants, interviewed hundreds of individuals – including source debriefings – and logged hundreds

of hours of surveillance. Also, your Affiant has sought advice from FBI Special Agents even more experienced in these matters. Through investigation and training, your Affiant has become familiar with the organization, planning, support, and financing of terrorism-related activities.

BASIS FOR KNOWLEDGE

3. The facts set out below are based upon information I have obtained from witnesses, informants, documents and other law enforcement personnel. Your Affiant has reviewed numerous audio and video recordings (and transcriptions/translations thereof) made by a Confidential Human Source, hereinafter referred to as Source-1. To the extent that these audio and video recordings include languages other than English, your Affiant has relied upon linguists employed by the FBI in order to understand the substance of those conversations. Where audio and video recordings have not yet been translated, your Affiant has relied upon the information provided by Source-1. I have not set out all of the information I have learned relating to the investigation, but only that necessary to show there is probable cause to believe that HOR I. AKL and AMERA A. AKL: conspired with each other and others to provide material support to a designated foreign terrorist organization, in violation of 18 U.S.C. Section 2339B; conspired with each other and others to violate money laundering statutes, in violation of 18 U.S.C.

3

Section 1956(h); committed arson, in violation of 18 U.S.C. Section 844(h)(1); and that HOR AKL committed bankruptcy fraud, in violation of 18 U.S.C. Sections 157(1) and 152(7), and perjury, in violation of 18 U.S.C. Section 1621(1).

<u>THE SOURCE</u>

4.   Source-1 is a confidential source of information with whom your Affiant meets with periodically and/or speaks to on the telephone.  The information provided by Source-1 during the personal meetings and telephone calls has been corroborated by video and/or audio of Source-1's interaction with investigative subjects, including Hor Akl and Amera Akl; these recordings establish her/his reliability in this matter.  Moreover, her/his reliability is supported by the fact that Source-1 has provided information to the FBI since 2003 on a continuing basis.  During this period, Source-1 has provided information directly to your Affiant for a total period of time of over 18 months.  During those time periods she/he has provided information that has proven reliable and of value to ongoing criminal and national security investigations.  Source-1 has not ever provided information that has been proven to be materially false.

Source-1 has previously provided reliable reporting in significant international terrorism matters out of the Toledo FBI office.  Despite the reliability of this corroborated information, no information provided by Source-1 was used

affirmatively by the government in any previous trial. In 2004, Source-1 demonstrated insufficient perception or confusion of a non-material fact, but Source-1 was not believed to have been deliberately dishonest. Source-1 has consistently demonstrated adequate perception of all material facts since beginning his cooperation with the FBI in 2003.

Source-1 was convicted in 2007 of petty theft by deception, in violation of Ohio Revised Code Section 2913.02(A)(3), a first-degree misdemeanor, stemming from the fraudulent use of her/his brother's insurance card in order to obtain emergency room care. She/he also was arrested for domestic violence in 2003 that was subsequently dismissed for lack of victim cooperation.

Source-1 has received approximately $23,425.07 from the FBI in source payments since 2003, with the bulk of this amount (approximately $19,220.96) occurring since October 1, 2009 for reporting related to this investigation. Additionally, in 2003 Source-1 was arrested/received by Immigration and Naturalization Services in Cleveland, Ohio. At that time, removal proceedings were instituted against Source-1 and her/his spouse, but were later suspended at the request of the FBI. On or about December 28, 2005, Source-1 and her/his spouse were admitted into the S-visa program at the request of the FBI in consideration for the information provided to that point by Source-1. On or about

December 28, 2008, the S-visa for Source-1 and her/his spouse expired, at which point Source-1 and her/his spouse were sponsored for lawful permanent resident status by the FBI in consideration for information provided to that point by Source-1.

Source-1's reporting with respect to Hor Akl and Amera Akl has consistently been corroborated by investigatory techniques employed in this case, including physical surveillance, and review of records, documents, and consensual recordings of the Akls and other individuals.

## THE CRIMINAL OFFENSES

5.   The facts set forth below establish probable cause that HOR I. AKL and AMERA A. AKL have committed the following offenses:

a.   **Conspiring to Provide Material Support to a Foreign Terrorist Organization**, in violation of Title 18, United States Code, Section 2339B, in that:  From on or about August 30, 2009, and continuing through the date of this Criminal Complaint, in the Northern District of Ohio, and elsewhere, defendants HOR I. AKL and AMERA A. AKL did knowingly combine, conspire and agree with and among each other, and with and among others, to provide material support and resources, to wit, currency and monetary instruments, tangible property, personnel, and services, to a foreign terrorist organization, to wit, Hizballah, which was designated by the Secretary of State as a Foreign Terrorist

6

Organization, pursuant to Section 219 of the Immigration and Nationality Act, on or about October 8, 1997, and has remained so designated since that time.

b. **Conspiring to Violate Money Laundering Statutes**, in violation of Title 18, United States Code, Section 1956(h), in that: From on or about August 30, 2009 and continuing through the date of this Criminal Complaint, in the Northern District of Ohio, and elsewhere, defendants HOR I. AKL and AMERA A. AKL, did knowingly combine, conspire and agree with and among each other, and with and among others, to commit offenses against the United States in violation of Title 18, United States Code, Sections 1956(a)(3)(A) and 1956(a)(3)(C), to wit, to knowingly conduct a financial transaction affecting interstate or foreign commerce involving property represented to be property used to conduct and facilitate specified unlawful activity, to wit, material support to a foreign terrorist organization in violation of Title 18, United States Code, Section 2339B, and with the intent to promote the carrying on of said specified unlawful activity, and with the intent to avoid a transaction reporting requirement under State and Federal law.

c. **Bankruptcy Fraud**, in violation of Title 18, United States Code, Section 157(1), in that: Beginning on or about a date uncertain, but at least as early as December 10, 2007, and continuing through the date of this Criminal Complaint, in the

7

Northern District of Ohio, the defendant HOR AKL devised a scheme and artifice to defraud his creditors, including Bank of America, Chase, Discover, and Fifth Third Bank, and the bankruptcy trustee in his bankruptcy case.

d. **Bankruptcy Fraud**, in violation of Title 18, United States Code, Section 1621(1), in that: On or about October 27, 2008, in the Northern District of Ohio, the defendant, HOR AKL, while under oath that he would testify, declare and depose truly as a witness and petitioner at the meeting of creditors held under Section 341 of Title 11 (the U.S. Bankruptcy Code), conducted by the trustee appointed by the U.S. Trustee's office regarding the defendant's bankruptcy case, and having taken the oath before the trustee in a bankruptcy case in which United States law authorized the administration of the oath, willfully and contrary to such oath gave testimony concerning a material matter which he did not believe to be true, in that the defendant, when asked by the trustee whether he had "given away, sold or transferred any property in the past year" and whether he had "made any payments or transferred any property to friends or family members within the past four years," answered "NO" to each question, and this testimony, as the defendant then well knew and believed, was false in that the defendant had transferred his property, including but not limited to funds, to family members within a year of said testimony.

e.  **Bankruptcy Fraud**, in violation of Title 18, United States Code, Section 152(7), in that:  From at least as early as December 10, 2007, through on or about August 29, 2008, in the Northern District of Ohio, and elsewhere, the defendant HOR AKL, in a personal capacity and in contemplation of a case filed by the defendant under Title 11 of the United States Code (the U.S. Bankruptcy Code) and with the intent to defeat the provisions of Title 11 of the United States Code knowingly and fraudulently transferred and concealed any of his property.

f.  **Arson**, in violation of Title 18, Untied States Code, Section 844(h)(1), in that:  On or about December 20, 2001 in the Northern District of Ohio, the defendants, HOR AKL and AMERA AKL, did knowingly use fire to commit a felony offense which may be prosecuted in a court of the United States, to wit, wire fraud, a violation of Title 18, United States Code, Section 1343, and mail fraud, a violation of Title 18, United States Code, Section 1341, in that the defendants did set fire to one 1998 Jeep Cherokee automobile, Vehicle Identification Number 1J4GZ7850WC12530, bearing Ohio license plate number BEE3621, and thereafter made an insurance claim related to the damage to the vehicle, which resulted in the issuance of a claim check.

FACTS ESTABLISHING PROBABLE CAUSE

6.   HOR I. AKL (hereinafter "HOR AKL") is a resident of Toledo, Ohio, and a dual citizen of the United States and Lebanon.   He is married to AMERA A. AKL (nee' Joseph and hereinafter "AMERA AKL").

7.   AMERA AKL is a resident of Toledo, Ohio and a citizen of the United States.   On or about September 30, 2009, AMERA AKL also obtained Lebanese citizenship.   AMERA AKL is married to HOR AKL.

8.   INDIVIDUAL A is a resident of Lebanon and a brother of HOR AKL.

9.   INDIVIDUAL B is a resident of Maumee, Ohio and a brother of AMERA AKL.

10.  INDIVIDUAL C is a resident of Toledo, Ohio, and the owner/operator of a car dealership in Toledo, Ohio.

11.  BUSINESS 1 is a bar in Toledo, Ohio.   HOR AKL and INDIVIDUAL B both work at BUSINESS 1.

12.  Hizballah was designated by the Secretary of State as a Foreign Terrorist Organization, pursuant to Section 219 of the Immigration and Nationality Act, on or about October 8, 1997, and has remained so designated since that time.   Accordingly, donations of money or other forms of material support to Hizballah were and are prohibited under U.S. law.

a.  HIZBALLAH OFFICIAL #1 is the Secretary-General of Hizballah and widely regarded as the leader of the organization.

b.  HIZBALLAH OFFICIAL #2 is the deputy to HIZBALLAH OFFICIAL #1.

## CONSPIRACY TO PROVIDE MATERIAL SUPPORT TO HIZBALLAH
## CONSPIRACY TO VIOLATE MONEY LAUNDERING STATUTES

13.  On or about August 30, 2009, AMERA AKL stated to Source-1, in sum and substance, that she was willing to transport funds to Hizballah in Lebanon on behalf of Source-1.  AMERA AKL asked, in sum and substance, what was "in it" for her.  AMERA AKL also asked Source-1 to which part of Hizballah the funds should go — the army or the families.  AMERA AKL then stated to Source-1, in sum and substance, that she could personally transport $20,000 per trip to Lebanon and suggested methods by which Hizballah could provide a receipt for the funds.  AMERA AKL offered to approach her husband, HOR AKL, in order to secure his assistance in transporting the funds to Hizballah.  With respect to the transfer of funds to Hizballah, AMERA AKL stated, "I can lead the way."  On this date, AMERA AKL also stated to Source-1, in sum and substance, that she dreamed of dressing like Hizballah, carrying a gun, and dying as a martyr.  A consensual recording of this conversation was produced by Source-1.

14.  On or about September 2, 2009, HOR AKL stated to Source-1, in sum and substance, that he had spoken to AMERA AKL about the

August 30, 2009 conversation with Source-1. HOR AKL further stated to Source-1, in sum and substance, that he had previously transported funds from the United States to Lebanon on his own behalf and on behalf of others. HOR AKL offered to personally transport funds on behalf of Source-1 and HOR AKL stated, in sum and substance, that he was "well-connected" in Lebanon. HOR AKL asked whether the total amount to be transferred was more than $1 million or approximately $500,000. HOR AKL also asked what percentage of the total amount to be transferred he would receive as a fee. HOR AKL further stated to Source-1, in sum and substance, that if his fee was approximately $300,000 to $400,000, then he would probably not return from Lebanon after transporting the funds. HOR AKL also proposed transporting funds by purchasing vehicles in the United States, then selling the vehicles in Lebanon for a profit.

15. On or about September 3, 2009, HOR AKL stated to Source-1, in sum and substance, that there were many options for transporting the funds to Lebanon, including through the purchase and sale of vehicles and electric generators. HOR AKL also stated to Source-1, in sum and substance, that in order to transport the funds, he would first need to travel to Lebanon. HOR AKL also stated to Source-1, in sum and substance, that sending the money to Lebanon would have a "cost." HOR AKL also stated to Source-1, in sum and substance, that he knew

individuals in Lebanon who were associated with, or members of, Hizballah and that his brother, INDIVIDUAL A, was an important person in Lebanon. A consensual recording of this conversation was produced by Source-1.

16. On or about September 3, 2009, AMERA AKL stated to Source-1, in sum and substance, that everyone would get their "cut" for participating and that "you do it the right way or you don't do it." AMERA AKL also stated to Source-1, in sum and substance, that they could have transferred $500,000 if they had been asked earlier in 2009, such as at the beginning of summer, when the travel to Lebanon would have coincided with well-established travel patterns. A consensual recording of this conversation was produced by Source-1.

17. On or about September 10, 2009, HOR AKL stated to Source-1, in sum and substance and in the presence of AMERA AKL, that he understood the funds were being transported to the "terrorists." HOR AKL also stated to Source-1, in sum and substance, that he understood the funds would be sent to a designated terrorist organization and used to target Israel. HOR AKL also detailed methods of transporting the funds to Lebanon, including purchasing and re-selling vehicles, and using individuals to carry the funds on their persons. HOR AKL further stated to Source-1, in sum and substance, that any individuals who carried funds on their persons would carry less than $10,000 in order to

13

avoid a reporting requirement. HOR AKL further stated to Source-1, in sum and substance, that he was familiar with the $3,000 reporting requirement related to money orders and Western Union wire transfers. HOR AKL also suggested methods by which Hizballah could provide a receipt for the funds. HOR AKL also stated to Source-1, in sum and substance, that he would charge a fee of thirty percent on a transfer of one million dollars. A consensual recording of this conversation was produced by Source-1.

18. Also on or about September 10, 2009, AMERA AKL stated to Source-1, in sum and substance, that she and HOR AKL had transported cash from the United States to Lebanon on prior occasions by concealing the cash on their persons and in magazines. A consensual recording of this conversation was produced by Source-1.

19. On or about October 20, 2009, HOR AKL stated to Source-1, in sum and substance, that transporting funds to Hizballah would result in him making money and gaining "some merits" at the same time. HOR AKL also suggested methods by which Hizballah could provide a receipt for the funds. HOR AKL also stated to Source-1, in sum and substance, that he knew individuals in the military branch of Hizballah and that he could arrange a meeting with HIZBALLAH OFFICIAL #1. HOR AKL also stated to Source-1, in sum and substance, that INDIVIDUAL A operated a recreation club

14

in Lebanon that was used frequently by Hizballah in order to conduct meetings. HOR AKL also stated to Source-1, in sum and substance, that AMERA AKL knew that Hizballah used the recreation club in order to conduct meetings. HOR AKL also stated to Source-1, in sum and substance, that he would travel to Lebanon and return with names, information, and a plan for transporting the funds. HOR AKL also stated to Source-1, in sum and substance, that he had well-established connections with Hizballah, in that Hizballah had stored artillery, firearms, and rockets in the family home of HOR AKL in Lebanon. A consensual recording of this conversation was produced by Source-1.

20. On or about November 3, 2009, HOR AKL stated to Source-1, in sum and substance, that he would travel to Lebanon and return with contact information for individuals within Hizballah. HOR AKL again stated to Source-1, in sum and substance, that he could meet with HIZBALLAH OFFICIAL #1 during a trip to Lebanon. HOR AKL also detailed various methods for transporting funds to Lebanon, including the use of post office boxes and offshore accounts in order to deposit money orders in amounts less than the $3,000 reporting requirement. HOR AKL also proposed using wealthy individuals in the United States who owned property in Lebanon to operate as unlicensed money transmittal services. HOR AKL also stated to Source-1, in sum and substance, that his objective was to make money and to perform good deeds. A

consensual recording of this conversation was produced by Source-1.

21. On or about December 7, 2009, HOR AKL stated to Source-1, in sum and substance, that he was ready to move forward with the plan to transport funds to Hizballah. HOR AKL discussed the timing of his departure to Lebanon and explained that he was going to Lebanon in order to personally meet with HIZBALLAH OFFICIAL #1, or other Hizballah representatives, in order to ensure that the funds would be received by Hizballah. HOR AKL also proposed using BUSINESS #1 to make funds "legitimate" by over-reporting cash income received, which would then be taxed. These "legitimate" funds could subsequently be declared, as required by federal law, during transport to Lebanon and forwarded on to Hizballah. HOR AKL stated to Source-1, in sum and substance, that he and INDIVIDUAL A were "well-connected" in Lebanon. A consensual recording of this conversation was produced by Source-1.

22. On or about December 16, 2009, HOR AKL discussed taking a trip to Lebanon and reviewed at least two methods of transporting funds to Lebanon, including shipping vehicles and using an offshore account in another country. HOR AKL also stated to Source-1, in sum and substance, that he had discussed these methods of transporting funds with INDIVIDUAL B and that they were INDIVIDUAL B's ideas. HOR AKL also discussed how he

would communicate with persons in the United States while he was in Lebanon. HOR AKL further stated to Source-1, in sum and substance, that he could be reached at certain telephone numbers in Lebanon. A consensual recording of this conversation was produced by Source-1.

23. On or about December 22, 2009, HOR AKL stated to Source-1, in sum and substance, that he was willing to travel to Lebanon anytime after the New Year. HOR AKL also discussed how he would communicate with persons in the United States while he was in Lebanon. HOR AKL further stated to Source-1, in sum and substance, that telephone coverage in Lebanon was good and that there were telephone numbers in Lebanon where he could be reached. A consensual recording of this conversation was produced by Source-1.

24. On or about January 12, 2010, HOR AKL stated to Source-1, in sum and substance, that he had consulted on several occasions with INDIVIDUAL B about transferring funds to Lebanon. HOR AKL further stated to Source-1, in sum and substance, that INDIVIDUAL B had devised numerous methods to transfer funds to Lebanon. HOR AKL agreed to arrange a meeting with INDIVIDUAL B the next day in order to discuss the transfer of funds to Hizballah. A consensual recording of this conversation was produced by Source-1.

25. On or about January 13, 2010, HOR AKL and INDIVIDUAL B met with Source-1. On this date, INDIVIDUAL B stated, in sum and substance, that he understood that the point was to move money from the United States to Lebanon without anyone knowing about it. When told that the funds would be transferred to Hizballah, INDIVIDUAL B stated, "I support Hizballah." INDIVIDUAL B further stated, in sum and substance, that he had no problem with the fact that the funds would go to support Hizballah's military activities. HOR AKL and INDIVIDUAL B proposed using couriers to carry cash to Lebanon in amounts less than the $10,000 reporting requirement. INDIVIDUAL B asked whether the funds were currently "clean," meaning not derived from criminal activity, held in a bank account, and on which taxes had been paid. INDIVIDUAL B also asked whether the funds were derived from criminal activity and held in cash. HOR AKL also proposed purchasing 15 to 20 pickup trucks to be resold in Lebanon as a method of transferring funds. HOR AKL and INDIVIDUAL B stated, in sum and substance, that a receipt from Hizballah signaling that the money had been received would be important. INDIVIDUAL B stated, in sum and substance, that Hizballah as the ultimate destination of funds was acceptable to him. A consensual recording of this conversation was produced by Source-1.

26. On or about January 22, 2010, HOR AKL stated to Source-1, in sum and substance, that INDIVIDUAL B was an additional

participant in the money transfer operation. On this date, Source-1 told HOR AKL that the money was "clean" and existed in a bank account, to which HOR AKL responded that this might mean he could transfer funds electronically to Lebanon. HOR AKL then produced a deposit receipt for a bank account in Lebanon in the name of INDIVIDUAL A. HOR AKL also stated to Source-1, in sum and substance, that the importance of his trip to Lebanon was to make connections. HOR AKL also stated to Source-1, in sum and substance, that Hizballah trusts INDIVIDUAL A because they are already doing business together. As a result of this relationship, HOR AKL also stated to Source-1, in sum and substance, that he too would be trusted by Hizballah. A consensual recording of this conversation was produced by Source-1.

27. On or about January 28, 2010, HOR AKL and INDIVIDUAL B met with Source-1. On this date, HOR AKL and INDIVIDUAL B were told by Source-1 that the funds existed in a bank account and totaled almost one million dollars. HOR AKL stated to Source-1, in sum and substance, that it was a "done deal" that he was going to Lebanon. HOR AKL also proposed transferring the funds using other individuals to wire transfer amounts less than the $3,000 reporting requirement. HOR AKL also stated to Source-1, in sum and substance, that the first step was for him to go to Lebanon in order to arrange a meeting with Hizballah representatives.

INDIVIDUAL B stated, in sum and substance, that an easy method of transferring funds was to send five couriers with cash to a third country, where the funds would be deposited into an offshore bank account and sent to Lebanon via wire transfer. INDIVIDUAL B and HOR AKL discussed how they would communicate while HOR AKL was in Lebanon in order to evade government surveillance. HOR AKL and INDIVIDUAL B agreed that HOR AKL would only call INDIVIDUAL B from a number in Lebanon with which INDIVIDUAL B had an already-established call pattern, such as with a relative. INDIVIDUAL B and HOR AKL also agreed to use code words involving work and business travel in order to conceal the true subject matter of their conversations. HOR AKL also stated to Source-1, in sum and substance, that Hizballah needed trucks to carry rockets. HOR AKL also stated to Source-1, in sum and substance, that he would not tell anyone about travelling to Lebanon. HOR AKL also stated to Source-1, in sum and substance, that he would use INDIVIDUAL A in order to arrange meetings with Hizballah representatives in Lebanon. HOR AKL also stated to Source-1, in sum and substance, that the likelihood was "100 percent" that he would meet with a "big boss," including HIZBALLAH OFFICIAL #1, during a trip to Lebanon. INDIVIDUAL B stated, in sum and substance, that he would not accompany HOR AKL on the first trip to Lebanon, but that he would be available to go any other time that was

necessary.  HOR AKL then stated that he would be available to travel to Lebanon in March.  A consensual recording of this conversation was produced by Source-1.

28.  On or about February 9, 2010, HOR AKL and INDIVIDUAL B met with Source-1.  INDIVIDUAL B stated to Source-1, in sum and substance, that they could use individuals employed at BUSINESS #1 to carry cash, in an amount less than the $10,000 reporting requirement, to a third country.  INDIVIDUAL B further stated, in sum and substance, that the employees of BUSINESS #1 would receive wire transfers, in amounts less than the $3,000 reporting requirement, while the employees were in the third country.  HOR AKL stated to Source-1, in sum and substance, that the funds could then be transferred from the third country to accounts in Lebanon opened under the name of INDIVIDUAL A and/or the names of HOR AKL's mother and sister.  HOR AKL also stated to Source-1, in sum and substance, that he would travel to Lebanon in order to withdraw the funds.  INDIVIDUAL B stated, in sum and substance, that he could travel to the third country to research the feasibility of this plan in person, as he would not research the plan over the Internet or while he was in the United States.

29.  On or about February 13, 2010, AMERA AKL stated to Source-1, in sum and substance, that she knew the details of the proposed transfer of funds and of HOR AKL's trip to Lebanon in

21

order to arrange a meeting with Hizballah representatives.
AMERA AKL stated to Source-1, in sum and substance, that HOR AKL
and INDIVIDUAL B could accomplish this part of the plan with no
problem. A consensual recording of this conversation was
produced by Source-1.

30. On or about February 17, 2010, HOR AKL agreed to travel to
Lebanon in early March, 2010. HOR AKL identified the travel
agent that he would use in order to make the travel
arrangements. HOR AKL also stated to Source-1, in sum and
substance, that he would fly via Air France and would purchase
the ticket in cash one week before his travel date. A
consensual recording of this conversation was produced by
Source-1.

31. Also on or about February 17, 2010, HOR AKL proposed an
additional method of transferring funds to Lebanon, using
appliances to hide cash and then shipping these appliances to
Lebanon, where HOR AKL would then retrieve the cash. HOR AKL
stated to Source-1, in sum and substance, that he had assisted
an individual with smuggling approximately $100,000 using this
method and that the same individual had previously smuggled over
two million dollars and weapons to Lebanon using this same
method. HOR AKL also proposed sending three refrigerators, each
concealing approximately $200,000 in cash, to Lebanon where HOR
AKL would meet each shipment in order to retrieve the cash. HOR

AKL also stated to Source-1, in sum and substance, that INDIVIDUAL B would be useful in transferring the funds to Hizballah because of his good credit, personal wealth, salaried job, and fluent English. HOR AKL also discussed the connections he planned to make in Lebanon with Hizballah and stated, in sum and substance, that INDIVIDUAL A would take HOR AKL to meet HIZBALLAH OFFICIAL #2. HOR AKL also stated to Source-1, in sum and substance, that he believed it would be possible to meet "the boss" while in Lebanon, referring to HIZBALLAH OFFICIAL #1. A consensual recording of this conversation was produced by Source-1.

32. On or about February 18, 2010, AMERA AKL stated to Source-1 that she made the reservation for HOR AKL's trip to Lebanon.

33. On or about February 18, 2010, HOR AKL stated to Source-1, in sum and substance, that he intended to meet representatives of Hizballah upon arrival in Lebanon and might be able to return early to the United States. HOR AKL also described his desire to have the funds available upon his return from Lebanon. HOR AKL once again proposed using appliances in order to conceal cash and stated, in sum and substance, that INDIVIDUAL B would purchase the appliances and make the shipping arrangements. HOR AKL also stated to Source-1, in sum and substance, that while he was in Lebanon, he would communicate only with AMERA AKL or INDIVIDUAL B by telephoning them from a relative's home in

23

Lebanon.   A consensual recording of this conversation was produced by Source-1.

34.  On or about February 23, 2010, HOR AKL and AMERA AKL went to a travel agency in Michigan where they purchased a round-trip ticket from Detroit to Beirut, Lebanon for approximately $1,060, a portion of which was paid for by HOR AKL and AMERA AKL.  On this date, HOR AKL again explained to Source-1 his plan to conceal the funds in appliances purchased by INDIVIDUAL B and shipped to Lebanon by INDIVIDUAL B.  A consensual recording of this conversation was produced by Source-1.

35.  On or about February 23, 2010, AMERA AKL stated to Source-1, in sum and substance, that HOR AKL would telephone AMERA AKL directly while he was in Lebanon and that AMERA AKL could then relay any messages from HOR AKL.  A consensual recording of this conversation was produced by Source-1.

36.  On or about February 27, 2010, HOR AKL stated to Source-1, in sum and substance, that he had spoken with INDIVIDUAL A via telephone and HOR AKL had instructed INDIVIDUAL A to keep the fact of HOR AKL's travel to Lebanon a secret.  A consensual recording of this conversation was produced by Source-1.

37.  On or about March 1, 2010, HOR AKL boarded an Air France flight at Detroit Metro Airport and departed for Beirut via Paris, France.

38. On or about March 3, 2010, AMERA AKL stated to Source-1, in sum and substance, that she had spoken with HOR AKL in Lebanon. AMERA AKL also stated to Source-1, in sum and substance, that HOR AKL would be meeting with the "doctor," meaning a high-level Hizballah leader, in two days. A consensual recording of this conversation was produced by Source-1.

39. On or about March 4, 2010, AMERA AKL stated to Source-1, in sum and substance, that she had spoken with HOR AKL in Lebanon and that HOR AKL was going to meet with the "doctor," meaning a high-level Hizballah leader. AMERA AKL also stated to Source-1, in sum and substance, that she would not let HOR AKL state the name of the "doctor" on the phone. A consensual recording of this conversation was produced by Source-1.

40. On or about March 10, 2010, HOR AKL arrived at Detroit Metro Airport on an Air France flight from Beirut via Paris, France. Upon arrival in the United States, HOR AKL made false statements to officials of the United States Customs and Border Patrol regarding the nature of his trip to Lebanon and the source of the funds used to pay for his travel.

41. Also on or about March 10, 2010, HOR AKL stated to Source-1, in sum and substance, that after several days in Lebanon, he and INDIVIDUAL A met with representatives of Hizballah, including HIZBALLAH OFFICIAL #1. HOR AKL further stated to Source-1, in sum and substance, that Hizballah was willing to

25

receive funds from Source-1, through HOR AKL, and would provide receipt of the funds by posting a pre-arranged message in a named, Hizballah-controlled publication. HOR AKL further stated to Source-1, in sum and substance, that the plan was still to conceal the funds inside appliances and that "we are ready" to send all the funds in one shipment. A consensual recording of this conversation was produced by Source-1.

42. On or about March 12, 2010, HOR AKL again stated to Source-1, in sum and substance, that he had arranged for a specific message to appear in a named, Hizballah-controlled publication upon receipt of the funds from Source-1 through HOR AKL. HOR AKL also stated to Source-1, in sum and substance, that he would meet with INDIVIDUAL B on this same date in order to update him on the details of the Lebanon trip and the plan to transfer funds. A consensual recording of this conversation was produced by Source-1.

43. On or about March 18, 2010, HOR AKL stated to Source-1, in sum and substance, that he was still willing to transfer the funds to Hizballah, but that he was waiting for the funds to arrive. HOR AKL then explained, in the presence of AMERA AKL, that the situation was very dangerous and that he would like to deliver the funds by May 8. HOR AKL further stated to Source-1, in sum and substance, that if the funds are not delivered by that date, then both HOR AKL and INDIVIDUAL A would be

26

questioned due to their meeting with Hizballah leaders. HOR AKL once again stated to Source-1, in sum and substance, that the funds would be transported using appliances to conceal them. HOR AKL further stated to Source-1, in sum and substance, that INDIVIDUAL B would purchase the appliances and make the shipping arrangements. HOR AKL also stated to Source-1, in sum and substance, that he could acquire a signal from Hizballah before receiving the funds, but that he would only arrange this for a fee of $10,000. A consensual recording of this conversation was produced by Source-1.

44. On or about March 18, 2010, AMERA AKL stated to Source-1, in sum and substance, that Hizballah would investigate HOR AKL's activities and would know with whom HOR AKL has been in contact. A consensual recording of this conversation was produced by Source-1.

45. On or about March 26, 2010, HOR AKL stated to Source-1, in sum and substance and in the presence of AMERA AKL, that he would arrange a signal from Hizballah before receiving the funds, but that he was reluctant to do so without providing some monetary contribution to Hizballah. HOR AKL proposed sending Hizballah an amount of $10,000 composed of $5,000 contributed by Source-1 and $5,000 that HOR AKL would borrow from INDIVIDUAL B. A consensual recording of this conversation was produced by Source-1.

46. On or about March 30, 2010, HOR AKL stated to Source-1, in sum and substance, that he would conceal the funds inside the AKLS' truck and then ship the vehicle to Lebanon. HOR AKL explained that INDIVIDUAL B would make the shipping arrangements for the truck. A consensual recording of this conversation was produced by Source-1.

47. On or about March 30, 2010, AMERA AKL met with a representative from the leasing company holding the title to the AKLS' truck in order to arrange for a purchase of the vehicle and a transfer of title to AMERA AKL.

48. On or about April 15, 2010, when asked what denomination of funds would be required in order to effectuate the money transfer, HOR AKL stated to Source-1, in sum and substance, that he would need $100 bills. On this date, HOR AKL also outlined a plan to transfer the funds by concealing them inside a Jeep Wrangler vehicle. HOR AKL also stated to Source-1, in sum and substance, that he would purchase a Jeep Wrangler at an auto auction in Toledo, Ohio with the assistance of a local car dealer, INDIVIDUAL C. HOR AKL then stated to Source-1, in sum and substance, that the funds would be concealed inside this Jeep Wrangler, which would then be shipped to Lebanon via the car dealership owned by INDIVIDUAL C. HOR AKL also stated to Source-1, in sum and substance, that depending upon the volume and size of the cash to be transferred, they may use a vehicle

28

owned by AMERA AKL in order to conceal the cash. HOR AKL also stated to Source-1, in sum and substance, that if two vehicles were necessary, then INDIVIDUAL B would provide the necessary funds to purchase a vehicle and obtain the title in order to ship the vehicle to Lebanon. HOR AKL further stated to Source-1, in sum and substance, that once the vehicle was shipped, he would purchase a plane ticket to Lebanon and would receive the vehicle with INDIVIDUAL A, who would assist HOR AKL in removing the funds and providing the cash to Hizballah. A consensual recording of this conversation was produced by Source-1.

49. On or about April 15, 2010, AMERA AKL stated to Source-1, in sum and substance, that she supported the transfer and just wanted to get it done. A consensual recording of this conversation was produced by Source-1.

50. On or about April 18, 2010, HOR AKL stated to Source-1, in sum and substance and in the presence of AMERA AKL, that he had spoken with INDIVIDUAL C about shipping vehicles to Lebanon; INDIVIDUAL C had suggested sending the vehicle inside a shipping container if they wished to limit scrutiny from customs officials. HOR AKL further stated to Source-1, in sum and substance, that INDIVIDUAL C had a schedule of pre-arranged shipping containers that depart approximately every fifteen days. HOR AKL further stated to Source-1, in sum and substance, that INDIVIDUAL B would purchase a vehicle, currently registered

in the name of AMERA AKL, in order to allow it to be shipped to Lebanon. HOR AKL further stated to Source-1, in sum and substance, that he would buy side-step rails for the vehicle, conceal the funds inside the side-step rails, and then attach the side-step rails to the vehicle. HOR AKL used a stack of one dollar bills in order to demonstrate the method that would be used to roll the funds and how the funds would sit inside the side-step rail. HOR AKL further stated to Source-1, in sum and substance, that he would cover the window in his garage with wood, in order to prevent anyone from observing him while he concealed the funds. A consensual recording of this conversation was produced by Source-1.

51. On or about April 26, 2010, HOR AKL stated to Source-1, in sum and substance and in the presence of AMERA AKL, that he would purchase a Jeep Wrangler upon receipt of the funds to be transferred. HOR AKL further stated to Source-1, in sum and substance, that INDIVIDUAL C could ship a vehicle every week, so the vehicle could be shipped upon receipt of the funds. HOR AKL further stated to Source-1, in sum and substance, that he had recently spoken to INDIVIDUAL A via telephone. HOR AKL further stated to Source-1, in sum and substance, that he was concerned about the need to complete the transfer of funds because one does not mess with Hizballah because they are dangerous. HOR AKL further stated to Source-1, in sum and substance, that he

had the best plan for transferring the money. HOR AKL further stated to Source-1, in sum and substance, that he would cover the window in his garage with wood on the next day. A consensual recording of this conversation was produced by Source-1.

52. On or about May 5, 2010, Source-1 observed that the window in the AKL's garage had been covered with wood in order to prevent others from observing any activities within the garage. This action was consistent with HOR AKL's statements on April 18, 2010 and April 26, 2010, that he would cover a window in the garage in order to prevent individuals from observing him while he concealed the funds within a vehicle or vehicle accessories.

53. Also on or about May 5, 2010, HOR AKL detailed to Source-1, in the presence of AMERA AKL, the steps to be taken in order to transfer funds to Hizballah, including purchasing a vehicle at an auto auction, concealing the funds inside the vehicle at the AKL residence, using a shipping company to send the vehicle to Lebanon, and travelling to Lebanon in order to recover the funds from the vehicle. HOR AKL further stated to Source-1, in sum and substance, that he would arrange to have the vehicles shipped from INDIVIDUAL C's dealership on the same date that the vehicle would be dropped off at the dealership. HOR AKL estimated that it would take three to four days to conceal the cash inside the vehicle. HOR AKL also stated to Source-1, in

sum and substance, that the AKLS would use their percentage of the funds to pay bills and start a business, but that this money would be left in the United States with AMERA AKL. A consensual recording of this conversation was produced by Source-1.

54. On or about May 13, 2010, AMERA AKL stated to Source-1 via telephone, in sum and substance, that on the previous day, she and HOR AKL went to an auto parts store, where AMERA AKL and HOR AKL located the side-step rails that would be used to conceal cash. AMERA AKL further stated to Source-1, in sum and substance, that she had obtained a parts catalog. During this conversation, AMERA AKL spoke using code words in order to conceal the true meaning of her conversation from law enforcement, including the use of code words such as "egg" and "chicken" in order to indicate dollar amounts and the transfer of funds. A consensual recording of this conversation was produced by Source-1.

55. On or about May 14, 2010, HOR AKL stated to Source-1, in sum and substance, that he and AMERA AKL would need five days in order to obtain title to the Dodge Ram pickup truck, but that the title could be obtained by paying the full amount owed on the truck. At some point prior to this date, HOR AKL purchased two "running boards" and two side-rails for the Dodge Ram pickup truck for approximately $700 in order to conceal the cash for transport to Lebanon. Also on this date, HOR AKL and AMERA AKL

demonstrated on their laptop computer the location of the Hizballah-controlled website where a pre-arranged phrase would be printed in order to signal receipt of the funds by Hizballah. A consensual recording of this conversation was produced by Source-1.

56. On or about May 17, 2010, AMERA AKL stated to Source-1, in sum and substance, that she would arrange to pay off the remaining balance on her 2004 Chevrolet Trailblazer in order to obtain title to the vehicle, thereby enabling HOR AKL to conceal the cash inside this vehicle and allowing for the vehicle to be shipped to Lebanon. HOR AKL stated to Source-1, in sum and substance, that he would purchase additional vehicle accessories in order to fit the 2004 Chevrolet Trailblazer for the concealment of cash. A consensual recording of this conversation was produced by Source-1.[1]

57. On or about May 18, 2010, HOR AKL stated to Source-1, in sum and substance, that AMERA AKL had arranged to pay the balance remaining on the 2004 Chevrolet Trailblazer and would do so the next day. HOR AKL also stated to Source-1, in sum and substance, that they would have the title to the 2004 Chevrolet Trailblazer and the accessories, including a front grill and side-step rails, for this vehicle by May 21, 2010. HOR AKL also

---

[1] Your Affiant has not had an opportunity to review the consensual recordings made after the May 17th meeting in their entirety because of the translation process. Source-1 has been debriefed after each meeting and the source reports based on those debriefings constitute the source of my information for the remaining paragraphs.

used a ruler and a stack of 100 one dollar bills in order to estimate the amount of cash that could be concealed within the vehicle accessories that would be purchased for the 2004 Chevrolet Trailblazer.  A consensual recording of this conversation was produced by Source-1.

58.  On or about May 20, 2010, the state of Ohio re-issued a title to AMERA AKL for the 2004 Chevrolet Trailblazer.  This title was issued to AMERA AKL after the lien attached by Fifth Third Bank was removed, indicating that full payment had been made on the outstanding balance owed on the 2004 Chevrolet Trailblazer.

59.  On or about May 24, 2010, HOR AKL stated to Source-1, in sum and substance, that he was ready and that he had obtained the parts that they need.  On this date, HOR AKL showed Source-1 the side-step rails that would be used to conceal the funds on the Chevy Trailblazer.  HOR AKL further demonstrated that, using the side-step rails, he could conceal $60,000 in each of the two steps on one rail; $100,000 in the curved area of the side-step rail; and an additional $150,000 in the area of the side rail between the two steps.  HOR AKL further stated to Source-1, in sum and substance, that he planned to place expanding foam in the end of the side-step rail and glue the black cap back on the end of the side-step rail.  HOR AKL further stated to Source-1, in sum and substance, that he could conceal additional funds

inside the back door of the Chevy Trailblazer. On this date, Source-1 observed a title to the Chevy Trailblazer that had been obtained by AMERA AKL after full payment had been made on the vehicle, thereby obtaining a title that was clear of any liens and, as a result, eligible to be shipped to Lebanon. A consensual recording of this meeting was produced by Source-1.

60. On or about May 30, 2010, HOR AKL stated to Source-1, in sum and substance, that he was going to purchase household items that would be shipped in a container along with the 2004 Chevy Trailblazer to Lebanon in order to avoid additional scrutiny from customs officials. HOR AKL further stated, in sum and substance, that he would have INDIVIDUAL C order the shipping container for June 3, 2010. HOR AKL further stated, in sum and substance, that if the funds were received on June 3, then the cash would be concealed within vehicle accessories on that date, the vehicle accessories would be installed on to the vehicle the next day, and the vehicle would be in the custody of the shipping company by June 4, 2010. HOR AKL further expressed his intent to arrive in Lebanon two weeks prior to the delivery of the vehicle. A consensual recording of this conversation was produced by Source-1.

61. On or about June 1, 2010, HOR AKL stated to Source-1, in sum and substance, that he had visited INDIVIDUAL C on this date and provided 300 dollars to reserve a shipping container. HOR

AKL further stated, in sum and substance, that the shipping container would be delivered on June 4, 2010, and would be picked up later on that date. HOR AKL further stated, in sum and substance, that he would meet with INDIVIDUAL C on June 2, 2010, in order to transfer title to INDIVIDUAL C to allow for shipping the 2004 Chevy Trailblazer to Lebanon. HOR AKL further stated, in sum and substance, that he would use latex gloves when handling the cash to be transferred and instructed Source-1 to do the same. HOR AKL further stated, in sum and substance, that he would use coffee grounds inside the vehicle accessories in order to disguise the cash from canines used by customs officials. A consensual recording of this conversation was produced by Source-1.

62. On or about June 3, 2010, Source-1 was provided with $200,000 in cash by the FBI and was observed entering the AKL residence, ~~████████████████~~, Toledo, Ohio, with HOR AKL. Shortly thereafter, HOR and AMERA AKL were found by agents of the FBI inside their residence wearing latex/rubber gloves in possession of approximately $200,000 in cash, various automobile accessories, plastic wrap, latex/rubber gloves, duct tape, and fragrant insect repellant sticks. Based on observations, some of the money had been prepared for secretion into the automobile accessories.

BANKRUPTCY FRAUD

62.  Beginning on or about a date uncertain but at least as early as December 10, 2007, and continuing through the date of this Criminal Complaint, in the Northern District of Ohio, the defendant HOR AKL devised a scheme and artifice to defraud his creditors, including Bank of America, Chase, Discover, and Fifth Third Bank, and the bankruptcy trustee in his bankruptcy case, in that:

a.   On or about December 10, 2007, HOR AKL requested and received an increase on his line of credit in his Bank of America account (BA 1369, hereinafter) from $4,000 to $26,600;

b.   On or about December 12, 2007, HOR AKL transferred $14,000 from account BA 1369 to his Huntington Bank account (H 1967, hereinafter);

c.   On or about December 20, 2007, HOR AKL transferred $11,000 from account BA 1369 to account H 1967;

d.   On or about December 26, 2007, HOR AKL issued a check to cash, in the amount of $766, from account H 1967;

e.   On or about January 4, 2008, HOR AKL issued a check to cash in the amount of $10,000, from account H 1967;

f.   On or about January 7, 2008, HOR AKL issued a check to cash in the amount of $3,000 from account H 1967;

g.   On or about January 12, 2008, HOR AKL transferred, in two separate transactions, $5,400 and $3,900 from his JP Morgan Chase credit card account, (JP 4293, hereinafter), to his wife's Discover card account, DC 4112, and Sears credit card account (S 4461), respectively;   On that same date, HOR AKL made two additional separate transfers from his other JP Morgan Chase credit card account, (JP 8279, hereinafter), totaling $8,250, into his wife's Bank of America credit card account (BA 9982), and Sears credit card account (S 4461);

h.   On or about January 15, 2008, HOR AKL obtained a $500 cash advance from account BA 1369;

i.   HOR AKL stated that he transferred as much as $170,000 overseas, to Lebanon, and transferred ownership of personal and real property from his name to family members' names, in anticipation of filing for bankruptcy in the United States;

j.   On or about August 28, 2008, HOR AKL caused the filing of a petition for personal bankruptcy under Title 11 of the United States Code, in the United States Bankruptcy Court for the Northern District of Ohio; and

k.   HOR AKL verified that the information provided in the petition and attachments was true and correct, under penalty of perjury.

63. On or about October 27, 2008, the defendant, HOR AKL, testified under oath at the meeting of creditors held under Section 341 of Title 11 (the U.S. Bankruptcy Code), conducted by the trustee appointed by the U.S. Trustee's office regarding the defendant's bankruptcy case. While under oath, the defendant, HOR AKL, willfully and contrary to such oath, gave testimony concerning a material matter which he did not believe to be true, in that the defendant, when asked by the trustee whether he had "given away, sold or transferred any property in the past year" and whether he had "made any payments or transferred any property to friends or family members within the past four years," answered "NO" to each question, and this testimony, as the defendant then well knew and believed, was false in that the defendant had transferred his property, including but not limited to funds, to family members within a year of said testimony. A copy of the audio recording of that testimony was obtained from the U.S. Bankruptcy Court.

64. From at least as early as December 10, 2007, through on or about August 29, 2008, the defendant HOR AKL, in a personal capacity and in contemplation of his bankruptcy case, and with the intent to defeat the provisions of Title 11 of the United States Code, knowingly and fraudulently transferred and concealed his property.

<u>ARSON</u>

39

65.  On or about December 20, 2001, the defendants, HOR AKL and AMERA AKL, did knowingly use fire to commit a federal felony offense, to wit, wire fraud, a violation of Title 18, United States Code, Section 1343, and mail fraud, a violation of Title 18, United States Code, Section 1341, in that the defendants set fire to their 1998 Jeep Cherokee automobile, Vehicle Identification Number 1J4GZ7850WC12530, bearing Ohio license plate number BEE3621.  Thereafter, they made an insurance claim related to the damage to the vehicle, which resulted in the issuance of a claim check, as follows:

a.  On or about August 3, 2009, AMERA AKL proposed engaging with Source-1 in "Lebanese Lightning," which she described as setting fire to one's vehicle, calling a towing company and the police, and falsely claiming that the car caught fire on its own.  AMERA AKL stated, in sum and substance, that she previously set fire to a 1998 Jeep in approximately late 2001.  AMERA AKL also described additional vehicles that she had burned for "reimbursement" from other individuals.  A consensual recording of this conversation was produced by Source-1;

b.  On or about December 20, 2001, HOR AKL requested the assistance of the Fulton County (Ohio) Sheriff's Department at the scene of a burning 1998 Jeep Cherokee automobile, Vehicle Identification Number 1J4GZ7850WC12530.  At this time, HOR AKL

stated, in sum and substance, that he was driving the above-described Jeep when his engine block caught on fire;

c. On or about December 21, 2001, HOR AKL telephoned Allstate Insurance in Florida and made an insurance claim related to the damage to the vehicle, which resulted in the issuance of a claim check to be sent via the United States mail from Allstate Insurance in Michigan to Firstar Bank in Wisconsin; and

d. As a result of the claim made by HOR AKL, a claim check in the amount of $17,296.06 was issued on January 23, 2002, by Allstate Insurance Company and sent via the United States mail system to Firstar Bank, N.A., in Oshkosh, Wisconsin, as settlement of the claim.

3:10 MJ 7048

66. For the following reasons, your Affiant respectfully requests that a Criminal Complaint against HOR AKL and AMERA AKL for Conspiring to Provide Material Support to a Designated Foreign Terrorist Organization, in violation of Title 18, United States Code, Section 2339B; Conspiring to Violate Money Laundering Statutes, in violation of Title 18, United States Code, Section 1956(h); and Arson, in violation of Title 18, United States Code, Section 844(h); and that a Criminal Complaint against HOR AKL for Bankruptcy Fraud, in violation of Title 18, United States Code, Sections 152(7), 157(1), and 1621(1), be accepted by this Court, and that this Court issue an arrest warrant for HOR AKL and AMERA AKL based on this Criminal Complaint.

Jonathan P.R. Jones
Special Agent
Federal Bureau of Investigation
Toledo, Ohio

Subscribed and sworn to before me this _3rd_ day of _June_, 2010.

Vernelis K. Armstrong
United States Magistrate Judge

42