UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

                      Case No. 10CR252
                      Hon. JAMES G. CARR
vs.                  Magistrate Judge VERNELIS K. ARMSTRONG

AMERA A. AKL,

        Defendant.

_____/

DUNCAN T. BROWN
Assistant US Attorney
801 Superior Avenue, W.
Ste. 400
Cleveland, OH 44113
(216) 622-3933
Email: Duncan.brown@usdoj.gov

JUSTIN E. HERDMAN
Assistant US Attorney
801 Superior Avenue, W.
Ste. 400
Cleveland, OH 44113
(216) 622-3965
Email: justin.herdman@usdoj.gov

THOMAS E. GETZ
Assistant US Attorney
801 Superior Avenue, W. Ste. 400
Cleveland, OH 44113
(216) 622-3840
Email: Thomas.Getz@usdoj.gov

SANFORD A. SCHULMAN
Attorney for Defendant: AMERA A. AKL
500 Griswold Street, Suite 2340
Detroit, Michigan 48226
(313) 963-4740
Fax: (248) 671-0353
Email: saschulman@comcast.net

_____/

## **DEFENDANT, AMERA A. AKL'S SENTENCING MEMORANDUM AND AMENDMENTS AND MODIFICATIONS TO PRESENTENCE INVESTIGATION REPORT AND REQUESTED COURT RECOMMENDATIONS**

## FACTUAL BACKGROUND

Amera Akl is not a terrorist and never was and never will be.  She was born in Toledo, Ohio thirty-eight years ago and has gone to school, college and raised her family in the Toledo area.  She has no prior criminal record or police contact.  More importantly, she has no political or religious ties to any terrorist organizations.  When she was arrested there was a thorough search of her home and personal property.  There was no evidence of any ties or connection to any terrorist organization.  No email, text message, phone numbers, books, letters, magazine, posters or even any suggestion of any ties to any terrorist organization.

So why is Amera Akl standing before this Court after having pled guilty to material assistance of a terrorist organization?  Simply stated, she took the bait.  She made the poor decision to let herself get pulled into a situation where her poor financial situation clouded her otherwise good judgment.  She went looking for a daycare provider for her youngest son Noah and ended up in a position where she will now be branded a terrorist, have a felony record, be separated from her family for at least thirty seven months, ostracized by her family and friends, likely to lose her home not to mention having to go to prison.  This case was not about terrorism.  It never was.  This case is and was about greed.

This Court is limited to only that information that has been provided to the defense.  In fact Fed. R. Crim. P. 32(i)(B) requires this Court to ONLY consider information that has been provided to the defense.  Indeed, federal courts have reversed convictions and remanded when a court considers facts outside that which

was provided to the defense.  See United States v Lobato (2008, CA10) 2008 US App

LEXIS 3656.  FRPC 32(i)(B) states specifically that at sentencing, the court must give

to the defendant and an attorney for the government a written summary of--or

summarize in camera--any information excluded from the presentence report under

Rule 32(d)(3) on which the court will rely in sentencing, and give them a reasonable

opportunity to comment on that information.

The indictment begins on or about August 30, 2009.  However, in reality the

case began many months prior.  The allegation is that in August of 2009, Amera Akl

stated to Source-1, in sum and substance, that she was willing to transport funds to

Hizballah in Lebanon on behalf of Source-1.  Amera Akl asked, in sum and substance,

what was "in it" for her.  Amera Akl also asked Source-1 to which part of Hizballah the

funds should go-the army or the families.  Amera Akl then stated to Source-1, in sum

and substance, that she could personally transport $20,000 per trip to Lebanon and

suggested methods by which Hizballah could provide a receipt for the funds.  Amera

Akl offered to approach her husband, Hor Akl, in order to secure his assistance in

transporting the funds to Hizballah.  With respect to the transfer of funds to Hizballah,

Amera Akl stated, "I can lead the way."  On this date, Amera Akl also stated to

Source-1, in sum and substance that she dreamed of dressing like Hizballah, carrying

a gun, and dying as a martyr.  A consensual recording of this conversation was

produced by Source-1.

The indictment fails to point out important and relevant history.  Indeed, the informant and the defendant had never met until September, 2008 and the defendant never sought out or solicited the informant for any illegal activity including but not limited to the allegations contained within the indictment.  In September, 2008, AMERA AKL was looking for a day care for her youngest son Noah so she could work with her husband HOR AKL at the Spice Grill Restaurant.

AMERA nor HOR were not looking for a contact to assist HIZBOLLAH and there is no evidence either of them had any ties to Hizballah.  There was no evidence and it is uncontested that Amera Akl had no prior contacts with any terrorist organization including Hezbollah.

In September, 2008, AMERA went to the CRESCENT LEARNING CENTER in Toledo Ohio where the informant and his wife owned and managed the daycare facilities.  AMERA AKL was aware that RAYNA, the informant's wife, owned the day care *but she did not know her husband.*  When AMERA AKL came to their daycare facilities she met with the informant.  The informant, it would later be learned, was mired by his own legal problems which included a conviction and deportation of his family.  AMERA and HOR AKL were seen as a valuable opportunity for the informant.

It is important to point out that AMERA AKL is taking responsibility for her actions.  Although she never initiated the discussions and plans to transport monies to Hizbollah, she never resisted.  She never walked away.  Instead, she readily took the initial suggestions by the informant and she consented to the plan and eagerly participated in devising the specifics.  Of course  the thought of a share of

4

$1,000.000.00 was the clear motive yet her persistence and willingness to formulate a scheme that would result in convincing the informant that not only was she willing but able to transport the funds service as the basis of her guilty plea.  The motive, it must reiterated, was financial, not political and her role, as suggested by the presentence investigator and with the stipulation of the Government, was minimal.

There is no evidence that either AMERA AKL or HOR AKL had any previous criminal history or ties to Hizbollah.  However, as early as their first meeting with the informant, AMERA AKL shared with the informant her family financial problems as her husband was struggling to pay his bills and maintain their restaurant.  AMERA and HOR AKL were under tremendous pressure to support their three minor children.  In fact in October, 2008, AMERA enrolled her two children at the CRESCENT LEARNING CENTER and soon thereafter AMERA inquired about a job at the CRESCENT CENTER to help subsidize the cost.  AMERA would soon thereafter complete training as a bus driver and work at the CRESCENT CENTER from November 2008 until May, 2009.

It was during this period of time, in October and November, 2008 that the informant began his attempts to gain the trust and confidence of AMERA and HOR.  They shared the same language and had some mutual friends.   The informant cleverly focused his attention on AMERA.  In fact on one occasion that was not recorded, the informant and AMERA are sitting in the informant's car (Nissan Maxima), during Ramada, smoking.  During this conversation in the car, the informant tells AMERA about the problems he is having with his wife RANYA and believes

"Ranya is building a case against me to ruin my life and business" and implies that he and Ranya are not regularly intimate.  This tactic was employed to provide a mutual bond between the parties and to continue to gain the trust of AMERA, knowing the entire time that her desperate financial condition may result in conduct that could provide an avenue for the informant to provide some type of assistance.  The defendant maintains that from the very inception the informant's, as an agent of the Government, intent was to promulgate a scenario which would lead to the Government providing immigration and financial rewards.

Of course AMERA AKL could have walked away.  She could have and should have had the sense to know that this money was coming too easy, that the informant was making it too easy and that the consequences of participating in such a plan would ultimately be devastating to AMERA and her family.

As was pointed out AMERA AKL was born and raised in the Toledo Ohio area and went to college in Akron.  Her children were all born in the Toledo area.  She has lived her entire life in Toledo and has no citizenship in any other country. HOR AKL, although born in Lebanon, has lived most of his life outside of Lebanon.  He has no ties to any terrorist organization and no allegiance to Lebanon.  In fact in 1994, HOR AKL actually refused to enter the military at the age of 16 years old after he was drafted and while awaiting the draft process he left Lebanon and went to Brazil where he lived with his uncle and brother. He did not return for several years.  Neither AMERA nor HOR AKL have any training as terrorists; absolutely no military training at all.

In 1993 HOR AND AMERA had met in Lebanon and married in Lebanon the same year. AMERA and HOR are cousins.  HOR obtained his US Citizenship in 1997 and in 2003, nine years after he refused to enter the Lebanese military, HOR returned to Lebanon to visit at which time he was arrested and held by the military court but later released.  Despite the penalty for refusal to participate in the military is up to 2 years in prison and a 15 million fine, HOR AKL, refused to be in the military.

While it is true that HOR's family resides in the small village of Libbaya in Southern Lebanon, there is no evidence that either HOR or AMERA have ever been a member of HIZBALLAH.  AMERA does not cover her hair and their life style is not strictly Muslim. As they attend weddings, smoke, play cards, etc.  There is no evidence that either AMERA or HOR ever participated in any political rallies, discussed HIZBALLAH, owned or even read any books or publications regarding HIZBALLAH or had any association with their organization.

AMERA left the CRESCENT LEARNING CENTER in May, 2009 to be with her family as the stress of work and raising a family became too difficult.  Times were not always so difficult for AMERA and HOR.  In fact HOR initially worked with ABDUL AKL his cousin when he first came to the United States in 1994 until June 21, 1997 at his establishment named Rumors. HOR then worked at Charlie's Restaurant as a cook starting in 1997 until August 18, 2007.  In 2005, HOR was offered the opportunity to run and operate a Charlie's restaurant.  However by 2007, eight restaurants opened in direct competition and  Charlie's began losing money.  This coupled with the failing economy and the $9,000.00 per month overhead led to HOR's business closing.

7

In September, 2007 HOR attempted to open his own restaurant Hotcakes. This latest business venture closed after only five months.  During this time the previous owner of Charlie's filed a law suit against HOR in regards to the debt incurred at Charlie's and in August, 2008, HOR files bankruptcy.

It should also be noted that for the three month period before the beginning of the indictment, the FBI via its informant recorded AMERA AKL no less than **nineteen times**, with each respective audio or video recording showing absolutely no desire by AMERA AKL to provide material support to a designated terrorist organization or engage in any other illegal activity.  There is absolutely no talk of Hizballah, terrorist organizations, or anti-Israel or anti Jewish sentiments. <u>FBI transcripts 1D1 - 1D6-03.</u>

This is the background that predates the August, 2009 date which begins the indictment.  At the time the indictment commences, the defendants, AMERA and HOR are desperate and vulnerable, but with no inclination to be involved with Hizballah. So how did the informant convince the Government to allow him to be wired and to record the conversations?  There is no evidence or even suggestion of any illegal activity prior to and even several months after recordings began.  The defense is not aware of what information has been specifically provided to the court, however, based on the discovery provided the defense maintains the informant simply lied to the Government.

The Government itself concedes that the informant had a history of unreliability.  The indictment maintains:  "in 2004, Source-1 demonstrated insufficient perception or confusion of a non-material fact, but Source-1 was not believed to have

8

been deliberately dishonest."  (Affidavit of Jonathon P.R. Jones  in support of a

criminal complaint at page 5).  It could easily be argued that the informant hoped to

manufacture some criminal activity with the goal of his own selfish and self-serving

goals, which specifically included $19,220.96 in source payments from the FBI since

October 1, 2009.  Id. At page 5.  However, the defendant, AMERA AKL, while not

initiating the contact or the scheme, readily participated in word and deed.  She now

stands before the Court having accepted reasonability.

The critical initial discussion of Hizbollah as provided in discovery began in

August, 2009, when AMERA talked with the informant about how Sunni Muslims

cannot use the interest from their money and instead donate it to charity and that she

was seeking such donations as charity for herself. It is clear that AMERA is extremely

vulnerable and on AUGUST 30, 2009, (TAPE 1D7: 22:05) the informant is actually the

first to mention the word HIZBOLLAH.

 The very first conversation regarding HIZBALLAH came up when the

informant was training AMERA for a job to teach English as a second language at the

CRESCENT LEARNING CENTER.  AMERA stated she had memorized the names of

the presidents by heart. The informant than asked her "[r]really? US Presidents or

Lebanese?" AMERA replied: "Starting with Washington. I don't know the Lebanese."

The informant adds: "For Hizballah's president."  AMERA immediately responds, "No.

We're not gonna Hizballah"  and changes the subject.  1D7 at p. 35. After the

informant approaches the subject again AMERA responds with:  "WHAT'S IN IT FOR

ME?"

As part of his plan, the informant would tell AMERA not to mention their discussion to HOR. (1D7: 22:41).  The informant would then lay out an elaborate scheme.  He mentions that he knows people take money to Israel to support HAMAS with money before but the boarder is not closed through Egypt and starts to give the impression that he has significant ties to various terrorist organizations.  As we now know, the informant did not have international ties to wealthy businessmen from Kuwait as he claimed.  The informant was simply "puffing" and playing a role.  The plan and scheme would be suggested and even developed by the informant as well as Amera Akl.   So while the informant would suggest that because money that goes to HIZBOLLAH will help HAMAS and he sought assistance providing funds to Hizbollah the defendant agreed to assist.  The informant knew, of course, that the defendants had some family in Lebanon and some knowledge of the country and cognizant of their financial situation made the likely targets.

The informant would tell AMERA and HOR that he knew a number of individuals from Kuwait who would provide a large amount of money to be delivered to Hizbollah.  However, neither AMERA nor HOR ever met with any such individuals.  Amera Akl hoped to receive a substantial sum of money and was willing to provide the appearance and support to carry out the plan.

The informant would later start to meet with HOR and on August 31, 2009 the informant and HOR met at the Crescent Center.  Hor assisted with minor jobs in an attempt to make some money.  In August, 2009, while fixing the door at the daycare, HOR and approaches the informant and asks him about the "deal" he is proposing to

AMERA.  So begins the next phase of the plan to induce AMERA and HOR together. Amera would later welcome her husband's involvement in hopes that together they might be able to receive the monies promised.

It is unclear exactly how much compensation the informant was receiving from the Government during this period of time or what he was telling the Government.  The Government did note that the informant was not always reliable in the past.

According to the indictment on or about September 2, 2009, Hor Akl stated to Source-1, in sum and substance that he had spoken to Amera Akl about the August 30, 2009 conversation with Source-1.  Hor Akl further stated to Source-1, in sum and substance, that he had previously transported funds from the United States to Lebanon on his own behalf and on behalf of others.  Hor Akl offered to personally transport funds on behalf of Source-1 and Hor Akl stated, in sum and substance,  that he was "well connected" in Lebanon.  Hor Akl asked whether the total amount to be transferred was more that $1 million or approximately $500,000.  Hor Akl also asked what percentage of the total amount to be transferred he would receive as a fee.  Hor Akl further stated to Source-1, in sum and substance, that if his fee was approximately $300,000 to $400,000, then he would probably not return from Lebanon after transporting the funds.  Hor Akl also proposed transporting funds by purchasing vehicles in the United States, then selling the vehicles' in Lebanon for a profit.

Just prior to September, 2009, the informant was initially upset that AMERA had discussed his proposal with her husband.  However, when it appeared they would

11

both take the bait, the informant gladly included HOR.  On September 2, 2009 and many times thereafter, the informant would come directly to AMERA and HOR's house to continue to gain a bond and trust.  (See CD/TAPE #1D8 (415H-cu-7530)

HOR expressed similar interest in carrying out the plan to transport funds to Hizbollah.  In fact HOR says at one point that this will be his only source of income. The informant would make it as easy as possible for AMERA and HOR act as couriers to transport monies to Hizbollah.  Interestingly there would be no real way of verification, no third party to confirm, the informant would have no contact with any of the alleged Hizbollah recipients and the only verification would be a receipt by Hizbollah in the form of the leader quoting the Koran.  The entire scheme was ridiculous and the informant would do anything to make sure that neither HOR nor AMERA would back out.  Amera wanted to make sure that the informant was convinced, however, of their ability and willingness to participate and to facilitate the transfer of monies to Hizbollah.

In order to convince the informant that AMERA and HOR were suitable candidates to receive the monies, AMERA and HOR would propose a number of unsubstantiated, untrue and embellished stories of past criminal activity. For example, Hor would tell the informant that at one time he transported $500 per month to family in Lebanon.  The informant never attempted to verify any of the claims made by AMERA and HOR.  An interview for employment at a Toledo fast food restaurant would likely warrant a higher level of scrutiny then required by the informant in the case at bar despite the plan to provide Amera and Hor with over $200,000 from

12

unnamed and unidentified individuals from Kuwait to be transported to unnamed and unidentified individuals in Lebanon associated with Hizbollah.

Hor would tell the informant that he was well connected to the individuals in Lebanon.  No proof was ever requested or provided and none exists.  There is and remains no evidence or documents provided to the defense that would suggest that AMERA had any contacts with any members of Hizbollah.  What made AMERA and HOR likely candidates for such an endeavor? Not their experience as couriers for a terrorist organization, because they had none.  Not their political ties, because they had none.  Nothing but their vulnerability and willingness to participate.  There is simply no information that has been provided to the defense that suggests that AMERA was able to act in the capacity of courier to a terrorist organization.  However, her words in the tape recorded conversations, suggests that Amera Akl was willing to assist in transportation of funds to Hizbollah.

It is alleged that on or about September 3, 2009, Hor Akl stated to source-1, in sum and substance, that there were many options for transporting the funds to Lebanon, including through the purchase and sale of vehicles and electric generators. Hor Akl also stated to source-1, in sum and substance, that in order to transport the funds, he would first need to travel to Lebanon.  Hor Akl also stated to Source-1, in sum and substance, that sending money to Lebanon would have a "cost".  Hor Akl also stated to Source-1, in sum and substance, that he knew individuals in Lebanon who were associated with, or members of, Hizballah and that his brother, INDIVIDUAL

13

A,  was an important person in Lebanon.  A consensual recording of this conversation was produced by Source-1.

Amera and Hor's intent was to make money.  Hor began to propose various ideas, many of which were legal, including purchasing vehicles in the United States, then selling the vehicles in Lebanon for profit.  The ideas were to generate money not to give money to Hizbollah.  Indeed, of the hundreds of hours of audio and video tape recordings the word Hizbollah is rarely mentioned.

At one point HOR suggested that he go to Lebanon.  He saw this as a free trip and an opportunity to visit his family.  HOR attempts to convince the informant that he had ties to the president of Hizbollah but even the informant has to acknowledge that such a claim is ridiculous and the informant says he did not believe that anyone could meet with the leader of HIZBOLLAH.

On or about September 3, 2009 it is alleged that Amera Akl stated to Source-1, in sum and substance, that everyone would get their "cut" for participating and that "you do it the right way or you don't do it." Amera Akl also stated to Source-1, in sum and substance, that they could have transferred $500,000 if they had been asked earlier in 2009, such as at the beginning of summer, when the travel to Lebanon would have coincided with well-established travel patterns.  A consensual recording of this conversation was produced by Source-1.

HOR went to LEBANON in March 2010 as a test run.  But no money was provided, no verification made.  Why didn't the informant give money at this point, or test to ensure that Hor had legitimate contacts with HIZBOLLAH.  No clear evidence

14

was every presented that established who HOR may have had contact with during his trip to Lebanon.  Amera has acknowledged as part of her plea that she knew that Hor was contacting members of Hizbollah with the intent of arranging to provide future material support.

The informant never attempted to verify any of these contacts or whether in the end HIZBOLLAH would actually receive any money.  The informant had much to gain if Hor was to make contact with Hizbollah and Amera and Hor would prepare for the monies to go to Lebanon.  The informant's goal, of course, was to keep the scheme alive and to get citizenship, avoid deportation while the Government continues to provide financial support. Verification of Hizbollah contact in Lebanon, therefore, was never verified.  Indeed, why wouldn't the informant , who speaks fluent Arabic, go to Lebanon or make connections directly.

In one very telling exchange, AMERA asks the informant if she should trust him and that she is desperate for money and then asks the informant if he knew anyone having a million dollars.  (1D-8, 18:34 )   It is at this time that the informant suggests that Hor go to Lebanon.   Hor would go without Amera and make the necessary contacts.  Again Amera did not terminate the plan.  She continued to encourage Hor while not being directly involved.

The Government further alleges that on or about September 10, 2009, Hor Akl stated to Source-1, in sum and substance and in the presence of Amera Akl, that he understood the funds were being transported to the "terrorist." Hor Akl also stated to Source-1, in sum and substance, that he understood the funds would be sent to a

15

designated terrorist organization and used to target Israel.  Hor Akl also detailed methods of transporting the funds to Lebanon, including purchasing and reselling vehicles, and using individuals to carry the funds on third persons.  Hor Akl further stated to source-1, in sum and substance, that any individuals who carried funds on their persons would carry less than $10,000 in order to avoid a reporting requirement. Hor Akl further stated to source-1, in sum and substance, that he was familiar with the $3,000 reporting requirement related to money orders and Western Union wire transfers.  Hor Akl also suggested methods by which Hizballlah could provide a receipt for the funds.  Hor akl also stated to source-1, in sum and substance, that he would charge a fee of thirty percent on a transfer of one million dollars.  A consensual recording of this conversation was produced by Source-1.

The September 10, 2010 meeting took place at HOR's family garage.  It was one of the few conversations where the phrase "terrorists" is used**.**  In what is almost a comical exchange, the informant actually used the term "designated terrorist organization" during one of their conversations. ( D-10, 22:41, September 10, 2009**)** Again there is no evidence of any PHOTOS OF TERRORIST IN AKLS's HOUSE.  NO POLITICAL BOOKS, MAGAZINES, NEWSPAPERS, ETC**.**  Amera, nevertheless, continued to show unwavering willingness to devise a realistic plan to transport the money.

Why the informant could not himself find someone in Lebanon to accept the funds is the begging question.  The answer, of course, is that no one wanted to suggest this.  It would have meant that the defendants would not have received their

16

hands on the cash and the informant would have faced certain deportation.  In fact there is never a discussion of the name(s) or descriptions or even the location where the monies were supposed to be delivered.  No description or profile or name of person in Lebanon ever provided.

On or about September 10, 2009, the indictment alleges that Amera Akl stated Source-1 in sum and substance, that she and Hor Akl had transported cash from the United States to Lebanon on prior occasions by concealing the cash on their persons and magazines.  A consensual recording or this conversation was produced by source-1.

On October 9, 2009, the informant would come to AMERA's house and again Amera talks to the informant about her difficult financial situation and how she purchases meatless meals for her children because of the expense of food.  At the same time, the informant would boast, with utter impunity, that he was scamming Lucas County by employing moms of the day care as students who were supposed to be taking ESL (English as a Second Language) but instead would simply "punch in" and leave and not attend classes while the informant received the money.  At the same time (D-12, Session 1, 21:37) AMERA continues to complain about her finances. AMERA says she needs $2200 for dental.  AMERA says she has a lot of debt.  HOR needs to work.

On or about October 20, 2009, Hor Akl stated to source-1 in sum and substance, that transporting funds to Hizballah would result in him making money and gaining "some merits" at the same time.  Hor Akl also suggested methods by which

17

Hizballah could provide a receipt for funds.  Hor akl also stated to source-1, in sum

and substance, that he knew individuals in the military branch of Hizballah and that he

could arrange a meeting with HIZBALLAH OFFICIAL #1.  Hor Akl also stated to

Source-1, in sum and substance, that INDIVIDUAL A operated a recreation club in

Lebanon that was used frequently by Hizballah in order to conduct meetings.  Hor Akl

also stated to source-1, in sum and substance, that Amera Akl knew that Hizballah

used the recreation club in order to conduct meetings.  Hor Akl also stated to source-1

in sum and substance, that he would travel to Lebanon and return with names,

information, and a plan for transporting the funds.  Hor Akl also stated to source-1, in

sum and substance, that he had  well-established connections with Hizballah, in that

Hizballah had stored artillery, firearms, and rockets in the family home of Hor Akl in

Lebanon.  A consensual recoding of this conversation was produced by source-1.

As part of the plea deal both defendants were required to plead guilty.  Ms. Akl

would indicate to the Court that she knew that Hor had made contact with Hizbollah, a

designated terrorist organization, in Lebanon and that she would assist him in their

plan to receive monies from the informant and arrange for the transfer of the funds to

Hizbollah.  In exchange for this acceptance of responsibility and plea, the government

agree d to a binding plea agreement and that guideline section 2M5.3 would be used

and the Base Offense Level be scored at 26.  The Government would therefore

reduce the possible sentence of 30 years in prison for the charge of material support

of a terrorist organization and recommend a two-level reduction for mitigating role as

well as a three point reduction for acceptance of responsibility.  Thereby reducing the

possible sentence to as low as 3 years and 1 month.  In addition, the Government would dismiss with prejudice the money laundering charge as well as the arson charge which alone would have mandated an additional ten year prison term that would have run consecutive to any sentence imposed for the material assistance of a terrorist organization charge.  In sum, the plea would reduce the forty year possible sentence and ten year mandatory minimum prison term to a range of 37 to 46 months with the further understanding that the Court could consider recommending any appropriate programs.  It would be illogical given the circumstances, the age of the defendant, AMERA AKL's minor children, and the exposure that AMERA would reject the offer.  She has accepted responsibility, abiding by the Court's sentence and hoping to reunite with her children to rebuild her family.

Despite HOR's statements to the contrary, there is no evidence that AMERA had any knowledge whether HOR made any contacts with SAAD HASSAN, the leader of Hizbollah, or any other Hizbollah members.  HOR claimed he met with members of HIZBOLLAH at a club while in Lebanon.  Of course it has never been alleged that Amera made any similar contacts.

On or about November 3, 2009, Hor Akl stated to source-1 in sum and substance, that he would travel to Lebanon and return with contact information for individuals within Hizballah.  Hor Akl again stated to source-1, in sum and substance that he could meet with HIZBALLAH OFFICIAL #1 during a trip to Lebanon.  Hor Akl also detailed various methods for transporting funds to Lebanon, including the use of post office boxes and offshore accounts in order to deposit money orders in amounts

less than the $3,000 reporting requirement.  Hor akl also proposed using wealthy individuals in the United States who owned property in Lebanon to operate as unlicensed money transmittal services.  Hor Akl also stated to source-1, in sum and substance, that his objective was to make money and to perform good deeds.  A consensual recording of this conversation was produced by source-1.

At one point HOR suggests various plans to transport funds and while he claimed he had "well established connection with Hizballah" or that he shot artillery, firearms and rockets in the family home.  No such evidence provided in discovery supports such claims.  Likewise the idea of post office boxes and offshore accounts is part of the volumes of discovery.  Amera Akl did acknowledge as part of her plea that she was aware of some contacts in Hizbollah.  Hor Akl appears to have kept the details mostly to himself.  Thus the three point reduction for her minimal role seems appropriate.

On or about December 7, 2009, Hor Akl stated to source-1, in sum and substance, that he was ready to move forward with the plan to transport funds to Hizballah.  Hor Akl discussed the timing of his departure to Lebanon and explained that he was going to Lebanon in order to personally meet with HIZBALLAH OFFICIAL #1 , or other Hizballah representatives, in order to ensure that the funds would be received by Hizballah.  Hor Akl also proposed using BUSINESS #1 to make funds "legitimate" by over reporting cash income received, which would then be taxed.  These "legitimate" funds could subsequently be declared, as required by federal law, during transport to Lebanon and forwarded on to Hizballah.  Hor Akl stated to souce-1,

in sum and substance, that he and INDIVIDUAL A were "well-connected" in Lebanon.
A consensual recording of this conversation was produced by source-1.

According to the indictment, on or about December 16, 2009 , Hor Akl
discussed taking a trip to Lebanon and reviewed at least two methods of transporting
funds to Lebanon, including shipping vehicles and using an off shore account in
another country.  Hor Akl also stated to source-1 in sum and substance, that he had
discussed these methods of transporting funds with INDIVIDUAL B and that they were
INDIVIDUAL B'S ideas.  Hor Akl also discussed how he would communicate with
persons in the United States while he was in Lebanon.  Hor  Akl further stated to
source-1, in sum and substance that he could be reached at certain telephone
numbers in Lebanon.  A consensual recording of this conversation was produced by
source-1.

 INDIVIDUAL B  appears to be involved in nothing more than puffing.
INDIVIDUAL B does not take any affirmative steps to supply any assistance to further
the scheme.  AMERA AKL, unfortunately, does.  In sum, the informant would make it
as easy as possible for AMERA and HOR to succeed and at the same time, AMERA
and HOR would continue to provide as many options as possible to accomplish their
"goal."  It is because of this intense desire to support HOR and to encourage him that
AMERA goes beyond mere talk and speculation.

For example, HOR tells the informant that while he is in Lebanon the informant
can contact him "certain telephone numbers" yet no phone numbers are provided or
even requested.   The informant does not once even attempt to contact him while he is

in Lebanon, not by phone, text message, email, nothing, either directly or indirectly to verified any of the contacts or information.

On or about December 22, 2009, HOR AKL stated to Source-1, in sum and substance that he was willing to travel to Lebanon anytime after the New Year. HOR AKL also discussed how he would communicate with persons in the United States while he was in Lebanon. HOR AKL further stated to Source-1, in sum and substance, that telephone coverage in Lebanon was good and that there were telephone numbers in Lebanon where he could be reached. A consensual recording of this conversation was produced by Source-1.

The indictment goes on to allege that on or about February 13, 2010, AMERA AKL stated to Source-1, in sum and substance, that she knew the details of the proposed transfer of funds and of HOR AKL's trip to Lebanon in order to arrange a meeting with Hizballah representatives. AMERA AKL stated to Source-1, in sum and substance, that HOR AKL and INDIVIDUAL B could accomplish this part of the plan with no problem. A consensual recording of this conversation was produced by Source-1.

On February 13th, Amera confirms the plan.  The informant, however, never attempts to verify the plan through any third party.  Even banks will verify ids, social security, and mother's maiden name.  However, the informant requests no verification of completion of the task and considering the informant and the defendant had no prior history or relationship it is extraordinary that such verification was not demanded.

Amera Akl does not deny this allegation.  However, it is important to note that the informant made it as simple and easily as possible for Amera to "provide material support to a designated terrorist organization."

On or about February 17, 2010, HOR AKL agreed to travel to Lebanon in early March, 2010. HOR AKL identified the travel agent that he would use in order to make the travel arrangements. HOR AKL also stated to Source-1, in sum and substance, that he would fly via Air France and would purchase the ticket in cash one week before his travel date. A consensual recording of this conversation was produced by Source-1.

On or about February 23, 2010, HOR AKL and AMERA AKL went to a travel agency in Michigan where they purchased a round-trip ticket from Detroit to Beirut, Lebanon for approximately $1,060, (a portion of which was paid by HOR AKL and AMERA AKL.).  On this date, HOR AKL again explained to Source-1 his plan to conceal the funds in appliances purchased by Hellal (INDIVIDUAL B) and shipped to Lebanon by Hellal (INDIVIDUAL B). A consensual recording of this conversation was produced by Source-1.

On February 23, 2010 the informant paid the entire fare for the tickets, AMERA and HOR had NO money to buy the ticket.  In fact AMERA was $60 short and had to borrow the balance from a third party.  The point, of course, that but for the informant providing the necessary funds it is unlikely that Hor would have had the resources to travel to Lebanon.  This does not excuse AMERA's continued willingness and eagerness to assist.

23

On or about February 23, 2010, AMERA AKL stated to Source-1, in sum and substance that HOR AKL would telephone AMERA AKL directly while he was in Lebanon and that AMERA AKL could then relay any message from HOR AKL. A consensual recording of this conversation was produced by Source-1.

At one point the informant wanted to give HOR a phone but HOR did not take a phone and did not want to bring a phone.

On or about February 27, 2010, HOR AKL stated to Source-1, in sum and substance that he had spoken with Samir (INDIVIDUAL A) via telephone and HOR AKL had instructed Samir (INDIVIDUAL A) to keep the fact of HOR AKL's travel to Lebanon a secret. A consensual recording of this conversation was produced by Source-1.  In fact friends and relatives clearly knew about the trip, many would wish HOR goodbye and it was clearly not a secret.

On or about March 3, 2010, AMERA AKL stated to Source-1, in sum and substance that she had spoken with HOR AKL in Lebanon. AMERA AKL also stated to Source-1, in sum and substance that HOR AKL would be meeting with the "doctor", meaning high-level Hizballah leader, in two days. A consensual recording of this conversation was produced by Source

It is alleged that on March 3, 2010 HOR claimed he would be meeting with the "doctor," in two days, however, he never supplies a name or a location or any other information. Indeed, the informant would at one point ask AMERA for the name of the doctor but AMERA would not be able to provide such a name because she simply was not aware of the name of the contact.

24

To demonstrate how desperate HOR and AMERA were at this point, the informant would suggest sums far less than the one million he initially suggested.  At one point the informant indicated that he would give $10,000 for a message that Hizbollah received the money and HOR said yes.  HOR was going to simply put an ad in the newspaper.  HOR was not willing to do it for mere 10,000.  However, HOR was willing for 5-10,000 to provide a signal in the form of a note in the Hizbollah publication and would put in general ad that read: WE APPRECIATE EVERYONE WHO HELPS BUILDS GAZA as a paid advertisement.

It was eventually agreed that HOR would ask for assistance in making shipping arrangements because HOR had never done anything like this and had no credit.

It is further alleged that on or about March 4, 2010, AMERA AKL stated to Source-1, in sum and substance that she had spoken with HOR AKL in Lebanon. AMERA AKL also stated to Source-1, in sum and substance that HOR AKL would be meeting with the "doctor", meaning high-level Hizballah leader. AMERA AKL also stated that she would not let HOR AKL say the name of the "doctor" on the phone.  A consensual recording of this conversation was produced by Source 1.

Also on or about March 10, 2010, HOR AKL stated to state to Source-1, in sum and substance, that after several days in Lebanon, he and INDIVIDUAL A met with representatives of Hizballah, including HIZBALLAH OFFICIAL #1. HOR AKL further stated to Source-1, in sum and substance, that Hizballah was willing to receive funds from Source-1, through HOR AKL, and would provide receipt of the funds by posting a pre-arranged message in a named, Hizballah-controlled publication. HOR AKL further

25

stated to Source-1, in sum and substance, that the plan was still to conceal the funds inside appliances and that "we are ready" to send all the funds in one shipment. A consensual recording of this conversation was produced by Source 1.  Amera Akl, it appears, was never directly involved in any of these discussion or negotiations.

It is true that on March 10, 2010 the informant would simply take HOR's word that he had met with high ranking officials of HIZBOLLAH without any verification, photos or any documents or evidence.

On or about April 15, 2010, AMERA AKL stated to Source-1, in sum and substance, that she supported the transfer and just wanted to get it done. A consensual recording of this conversation was produced by Source 1.  It is interesting to note that at this critical point in this case there is almost no mention of Hizbollah for months.  That is because this entire case, in fact, has little to do with Hizbollah.  It is almost entirely focused on the financial aspects.  Indeed, HOR and AMERA suggested to the informant that he should buy a JEEP WRANGLER which would be bigger and provide more space to secret money to send to Lebanon.  This would be a way of getting a new vehicle in Lebanon and could be retained by the defendants.

It is alleged that on or about April 18, 2010, HOR AKL stated to Source-1, in sum and substance, and in the presence of AMERA AKL, which he had spoken with INDIVIDUAL C about shipping vehicles to Lebanon; INDIVIDUAL C had suggested sending the vehicle inside a shipping container if they wished to limit scrutiny from custom officials. HOR AKL further stated to Source-1, in sum and substance that INDIVIDUAL C had a schedule of pre-arranged shipping containers that depart

26

approximately every fifteen days. HOR AKL also stated to Source-1, in sum and

substance that INDIVIDUAL B would purchase a vehicle, currently registered in the

name of AMERA AKL, in order to allow it to be shipped to Lebanon. HOR AKL further

stated to Source-1, in sum and substance, that he would buy side-step rails for the

vehicle, conceal the funds inside the side-step-rails, and then install side-step-rails to

the vehicle. HOR AKL used a stack of one-dollar bills in order to prevent anyone from

observing him while he concealed the funds. A consensual recording of this

conversation was produced by Source-1.

There is no evidence that Individual C was ever aware that any monies were

going to be sent to Lebanon.  Individual C was never asked about how to secret

money in the container.  This suggests that HOR may never have intended to ever

send the monies.  HOR would never appear to have sought direction or advice on how

to deliver the monies.**.**

     In fact there are a number of occasions during the course of the discussions

between the informant and the defendants when the defendants would propose some

other type of illegal activity in order to make a profit.  For example, at one point HOR

suggest that coffee beans be placed on certain items.  This idea, as did many, would

come directly from various Hollywood movies and not from any sophisticated terrorist.

The indictment states that on or about April 26, 2010, HOR AKL stated to

Source-1, in sum and substance, and in the presence of AMERA AKL, that he would

purchase a Jeep Wrangler upon receipt of the funds to be transferred. HOR AKL

further stated to Source-1, in sum and substance, that INDIVIDUAL C could ship a

vehicle every week, so the vehicle could be shipped upon receipt of the funds. HOR AKL further stated to Source-1, in sum and substance that he had recently spoken to INDIVIDUAL A via telephone.  HOR AKL further stated to Source-1, in sum and substance, that he was concerned about the need to complete the transfer of funds because one does not mess with Hizballah because they are dangerous. HOR AKL further stated to Source-1, in sum and substance, that he had the best plans for transferring the money. HOR AKL further stated to Source-1, in sum and substance, that he would cover the window in his garage with wood on the next day.  A consensual recording of this conversation was produced by Source-1.

The indictment assumes that the shipping container was to avoid scrutiny from customs officials when it was actually to PROTECT THE ITEMS FROM BEING DESTROYED OR STOLEN.  Hor would try to convince the informant that the shipping container was to avoid customs but really it was a third party's idea to protect the items and nothing to do with customs as customs could search at any time.

 HOR attempted to convince the informant how he was going to place the funds in the side-step rail.  Interestingly HOR did not attempt to hide the money in the transmission which would be far more complicated and far less likely to be detected. HOR would demonstrate this to the informant in his living room.  The plan, of course, was unsophisticated.  While HOR would cover the window in garage to prevent anyone from observing, the garage was not closed when the informant brought the money to the house.

On or about May 5th, 2010, Source-1 observed that the window in the AKL's garage had been covered with wood in order to prevent others from observing any activities within the garage. This action was consistent with HOR AKL's statements on April 18, 2010 and April 26, 2010, that he would cover the window in the garage in order to prevent individuals from observing him while he concealed the funds within a vehicle or vehicle accessories.

As far as AMERA was aware, at no time did it appear that anyone in particular from Hizbollah actually knew or was aware of the plan.  There is no evidence that AMERA ever had any contact with any member of Hizbollah. In the end, the plan was almost childish and clearly unsophisticated.  HOR would take off the step-rails of the Blazer in the driveway of his house in open day light and the monies would be concealed.

The government alleges that the AKLS would use their percentage of the funds to pay bills and start a business, but that this money would be left in the United States with AMERA AKL. A consensual recording of this conversation was produced by Source-1.

Amera maintained even until the day of her arrest that the monies she received would be used to pay necessary marital bills and to hopefully start a business.  Amera had expected $200,000.00 as their percentage but when presented with a total of $200,000.00 thus significantly diminishing any profit, Amera still continued with the proposed plan.

29

Most interestingly, despite the plan that HOR was going to meet the Trail Blazer in Lebanon with the funds, HOR had never purchased a plane ticket, nor did AMERA. Based on the discovery provided, there is ample evidence that while Amera indicated in word that they intended to transport the funds to Hizbollah there is no evidence that Amera's primary concern was to retain the proceeds or as much of the proceeds as she could.

It is alleged that on or about May 14th, 2010, HOR AKL stated to Source-1, in sum and substance, that he and AMERA AKL would need five days in order to obtain title to the Dodge Ram pickup truck, but that the title could be obtained by paying the full amount owed on the truck. At some point prior to this date, HOR AKL purchased two "running boards" and two side-rails for the Dodge Ram pickup truck for approximately $700 in order to conceal the cash for transport to Lebanon. Also on this date, HOR AKL and AMERA AKL demonstrated on their laptop computer the location of the Hizbollah-controlled website where a pre-arranged phrase would be printed in order to signal receipt of the funds by Hizbollah. A consensual recording of this conversation was produced by Source –1.

While on their driveway, the informant uses the AKL's computer and pulls up the HIZBALLAH website.  This computer would later be seized as part of a raid and there would be no evidence of any history or content associated with Hizbollah on the computer, in the home, or anywhere associated with the AKLS.  Indeed there were no emails, no website searches, and no "favorites" involving Hizbollah.

The informant was simply going to drop off the money to the AKLS, he would not ensure that the monies were actually on the vehicle when it was transported. The informant was NEVER GOING TO ESCORT THE VEHICLE TO THE DROP OFF POINT TO ENSURE THE MONEY WAS IN THE VEHICLE.   The informant HAD NO PLAN TO ENSURE THE MONEY WAS REALLY IN THE VEHICLE.  Instead, the informant was going to wait across the street from the dealership but that would not ensure the money was actually on the vehicle.

The informant had no way of verifying that the monies ever made it to Lebanon. Of course not, he just wanted to accomplish his goal of having the appearance that the defendants would send the funds to a designated terrorist organization.  He made it as easy as possible. Again, although the informant could speak fluent Arabic he was unable to get one individual to verify the transfer?  How would he know the money would be on the vehicle on the boat?  How would he know the monies arrive in Lebanon?  How would he know the monies would be transported to Hizbollah.  He did not know or care.  Just as long as it appeared it would be on the vehicle and the boat and eventually to Hizbollah.

The plan was to give the money to HOR and the next day the vehicle would be delivered for shipment.  Of course that would leave twelve hour or so for the AKLS to remove the monies without verification.  Plan was that the money was going to be installed the NEXT DAY.  Without anyone being there.  Without the informant being present.  Why would  the informant agree that he would give the money and then HOR would "hide the money the next day."

31

In addition, the informant, never threatened HOR and AMERA that if they did not get the money to Hizbollah that anything would happen to them.  Hor would make all the arrangements but wouldn't the informant want to make the arrangements to ensure that it was done properly?   Couldn't the informant have made all the arrangements himself, met personally with individual C who transports the vehicle , arranged to come to Amera and Hor's house on June 4th at 5:00 a.m. and made further assurances that the funds were, in fact, in the vehicle when it was placed on the dock.  In the end, the informant could have driven directly to the dock and waited to watch the vehicle leave but that never occurred.

On or about June 3, 2010, Source-1 was provided with $200,000 in cash by the FBI and was observed entering the AKL residence, Toledo Ohio, with HOR AKL.  Shortly thereafter, HOR and AMERA AKL were found by agents of the FBI inside their residence wearing latex/rubber gloves in possession of approximately $200,000 in cash. Various automobile accessories, plastic wrap, latex/rubber gloves, duct tape, and fragrant insect repellant sticks. Based on observations, some of the money had been prepared for secretion into the automobile accessories.

It is interestingly to note that the Government would not wait to see if, in fact, HOR and AMERA actually delivered a vehicle to the shipping location with the monies in the vehicle.  Instead, they are arrested right there, in their house, with their children present.  Had the Government waited to see the case would have crumbled.  The vehicle would not have had any of  the cash because it was destined not for Hizbollah or Lebanon but for the pockets of AMERA and HOR.

32

In short, while the informant did whatever he could to make sure that the defendants went through with a plan, it was ultimately the defendants, including AMERA, who took all necessary steps to carry out the plan.  The informant did not require the defendants to verify any association with a terrorist organization, never had any corroboration and suggested ridiculous methods of verification.  Even as late as the final days, the funds were to be simply handed over without anyone overseeing or verifying and the defendants were arrested in their own home before they had an opportunity to keep the funds and deliver nothing more than a vehicle for transport.

In the end, AMERA AKL, cannot avoid the fact that for months during the time set forth in the indictment she readily spoke of providing material assistance to a designated terrorist organization.  The fact that she did not initiate the conversations or meetings with the informant is irrelevant.  The fact that the informant would make it as easy as possible for a plan to be devised, even defying logic by, for example, not requiring any verification is also irrelevant.  The fact that AMERA was arrested before the monies were placed in the vehicle thus depriving her of the opportunity to withdraw from the "plan" is irrelevant.  What is relevant is that AMERA saw this as an opportunity to make easy money and she became blinded to the point of not seeing how ridiculous it was and how severe the penalties.

## OBJECTIONS TO PRE-SENTENCE REPORT

PARAGRAPH 92.  The defendant does not reside with her children at the marital home.  The defendant, AMERA AKL, resides at 3617 Barcelona, Toledo, Ohio, with her sister, Attaya Mohammad, and her brother-in-law.  The defendant's husband

33

resides in the marital home at 3911 Brookfield Drive, Toledo, Ohio 43623 with the

three minor children.  They lived in the home for the past 11 years and the children

attend the Sylvania School  system. Home visits have been conducted

throughout the past year by U.S. Pretrial Services on a routine basis including on May

26, 2011. Their home is a three-bedroom home with a basement situated on a corner

lot in Sylvania Township.

PARAGRAPH 105:  FINANCIAL CONDITION:  The pre-sentence investigator

failed to include the second secured mortgage on the marital home with Fifth Third

Bank which is currently $12,000.00.  There is no equity in the marital home located at

XXXX Brookfield Drive, Toledo, Ohio 43623

**SENTENCING CONSIDERATIONS**

Pursuant to 18 U.S.C. 3553(a), in determining the imposition of

sentence, this Court should consider the following in imposing sentence: The nature

and circumstances of the offense; the history and characteristics of the defendant; the

need for the sentence imposed to reflect the seriousness of the offense; to promote

respect for the law and to provide just punishment for the offense; to afford adequate

deterrence to criminal conduct; to protect the public from further crimes of the

defendant; to provide the defendant with needed educational or vocational training,

medical care, or other correctional treatment in the most effective manner; the need to

avoid unwarranted sentencing disparities among defendants with similar records who

have been found guilty of similar conduct; and the need to provide restitution to any

victims of the offense.

The directives of <u>Booker</u> and 18 U.S.C. Section 3553(a) make it clear that courts need no longer uncritically apply the guidelines and only depart in "unusual cases" for clearly identified and persuasive reasons. This Court is now allowed to tailor a sentence to fit the above statutory directives and yet be effective and fair. Unfortunately in this case the court has little discretion.  However, given the totality of the circumstances, the lack of criminal history, the minimal involvement and the nature of the plea agreement, the defendant, AMERA AKL, would respectfully request a sentence on the lowest end of the guidelines as stipulated by the Government and the defense as outlined by the Rule 11 Plea Agreement and consistent with the pre-sentence report to a sentence in the Bureau of Prison for a period of 37 months.

## <u>CONSIDERATION FOR TIME SERVED WHILE ON HOUSE ARREST</u>

The defendant is aware and has been advised that she does not appear to be eligible for credits even if the Court deemed it appropriate for the time she has been under house arrest and unable to leave her sister's home for any reason except for court, meet with probation and to meet with her attorney.  A defendant shall be given credit toward the service of a term of imprisonment for any time he has spent in *official detention* prior to the date the sentence commences . . . as a result of the offense for which the sentence was imposed." 18 U.S.C. § 3585(b) (1988) (emphasis added). "When conditions of release approach those of incarceration, a person is in 'official detention' for purposes of section 3585." Mills v. Taylor, 967 F.2d 1397, 1400 (9th Cir. 1992).

The Court can consider that there has been a significant restriction on the defendant's right to travel, be with her family, reside in her marital home, work, live with her husband, attend her children's school or social activities, go to stores, restaurants, shop or otherwise interact with her family who have been unable to visit with her.

The Government does have the authority to stipulate to credit for the time AMERA has been imprisoned in her sister's house despite the statute and the case law and we would welcome that stipulation.

<u>REQUEST FOR RECOMMENDATION FOR DRUG TREATMENT PROGRAM THROUGH THE BUREAU OF PRISON</u>

Title 18 U.S.C. § 3621 governs the imprisonment of persons convicted of federal crimes. In 1990, Congress amended the statute to provide that "the Bureau shall . . . make available appropriate substance abuse treatment for each prisoner the Bureau determines has a treatable condition of substance addiction or abuse." Pub. L. 101-647, § 2903, 104 Stat. 4913. Four years later, Congress again amended § 3621, this time to provide incentives for prisoner participation in BOP drug treatment programs. The incentive provision at issue reads: "The period a prisoner convicted of a nonviolent offense remains in custody after successfully completing a treatment program may be reduced by the Bureau of Prisons, but such reduction may not be more than one year from the term the prisoner must otherwise serve." Pub. L. 103-322, § 32001, 108 Stat. 1897 (codified at 18 U.S.C. § 3621(e)(2)(B)).

Paragraph 95 of the presentence report states that the defendant reported that she takes pain killers as often as she can to deal with her medical problems and she is addicted to them. She indicated that she cannot function without Tylenol 3, Oxycontin or Vicodin. She has received prescriptions in the past from her doctor. She reported that her doctor prescribed Tylenol 3 for frequent migraine headaches and other painkillers for various issues in the past.

Likewise paragraph 97 states: The defendant has abused prescription pain killers by hoarding them from previous medical conditions.  She has numerous bottles of various pain killers that she uses as needed, but she indicated that she does not buy them on the street. She has been prescribed Tylenol 3,Oxycontin and Vicodin in the past and keeps them around to take them as needed for coping. She stated that she believes she is addicted, but she has not received treatment. She tested negative for controlled substances on June 4, 2010.

Based on the aforementioned, it is respectfully requested that this Court recommend that this Court recommend that the defendant, AMERA AKL, be permitted at the discretion of the Bureau of Prisons, any appropriate drug and substance abuse treatment programs in accordance with 18 U.S.C. § 3621that are deemed appropriate and available.

### REQUEST FOR PLACEMENT IN SPECIFIC DESIGNATED BUREAU OF PRISONS FACILITY

The defendant is acutely aware that under the law, the Bureau of Prisons has the sole discretion as to where to place inmates, and this Court must not unduly tie its

37

hands. See 18 U.S.C. §§ 3621(b), 3625.  However, the Bureau of Prisons will consider the recommendations of this Court as well as the information provided in the Presentence Investigation Report in determining the appropriate facility in which to place a defendant.

As the Court is aware, the defendant has three minor children who will continue to reside in the Toledo, Ohio area.  The children attend schools in Toledo, Ohio and have their immediate family there.  It is anticipated that Amera's husband, Hor, will be in custody in the near future.  The extended family will have the responsibility to raise and support the minor children while the parties are incarcerated.  It is important during this time that the children have as much contact with their mother as possible.  A placement in a facility that is of significant distance will bar the children from having periodic visits with their mother.

The defense is requesting this Court recommend the defendant, if deemed eligible by the Bureau of Prisons, be placed in the Federal Reformatory for Women in Alderson, West Virginia or any other appropriate facility that may service the same goal, to punish by imposing incarceration while still considering the reasonable needs of the minor children and thus providing the opportunity for periodic visits by placement in a facility close enough to Toledo, Ohio to satisfy both needs.

## REQUEST TO ALLOW THE DEFENDANT TO SELF-SURRENDER TO THE DESIGNATED BUREAU OF PRISON FACILITY

The defendant is requesting the opportunity to allow for her to self-report upon receipt of notification from the Bureau of Prisons of the designated facility. Her

attorney, Sanford A. Schulman, is prepared to transport the defendant at no cost to the Government directly to the designated facility. Ms. Akl may likely self-surrender prior to the deadline set by the Bureau of Prisons as she is hoping to begin her prison sentence as soon as possible to minimize the time the minor children are without both parents.

This Court has the discretion to allow the defendant, AMERA AKL, to voluntarily surrender directly to the designated Bureau of Prison Facility. United States v. Thornburgh, 2011 U.S. App. LEXIS 10875 (10th Cir. Okla. May 27, 2011) In this case, the defendant has complied with all pre-trial terms and conditions set by this Court. Moreover, she is anxious to commence her sentence and her counsel is willing to provide direct transportation to the designated facility at no cost to the federal Government. The defendant would respectfully request this Court allow her to voluntarily surrender on or before the date and time and location designated by the Bureau of Prisons. See also Rennick v. United States, 2005 U.S. Dist. LEXIS 34695 (E.D. Ky. Dec. 20, 2005)

## REQUEST TO MODIFY THE TERMS AND CONDITIONS OF BOND PENDING INCARCERATION

Ms. Akl continues to pose neither a danger to the community nor is she a risk of flight under 18 U.S.C. § 3142(f). She has fully complied will all the terms and conditions set forth by this Court since her release after her initial appearance. Ms. Akl has been ordered to house arrest for over a year since June 10, 2010 and has complied with every single term and condition imposed.

39

This Court has modified the terms of bond and Ms. Akl has never abused this privileged.  However, she is seeking one final amendment of the bond conditions to allow her to reside in the marital home with her husband and children pending her surrender date.  The current conditions set by the court prevent the parties from residing together at the marital home, require a family member to be with the parties at all time.

It has already been noted that Amera Akl will not likely receive credit for any of the time she has been on bond and locked in her sister's house and prevented from being with her family.  If this Court allows her to reside at the martial home pending her surrender date she will likely not receive any credit either.  However, the days prior to surrender are critical for the immediate family, especially the youngest child who will be six years old in August.

The Court can set conditions of release that take into consideration the safety of the community, as stated in 18 U.S.C. §3142(c).  Ms. Akl does not have any money or a passport or the desire to in any way jeopardize or compromise her current situation. She tendered a plea of guilty and is prepared to serve her sentence.  This request, to allow her to reside at the marital home with a guardian, will not impose any more risk than currently exist or are perceived to exist. The request is likely for a relatively short period of time and would allow for the defendant's children to have some semblance of normalcy before both their parents are incarcerated.

WHEREFORE, the Defendant, AMERA A. AKL, by and through her attorney, SANFORD A. SCHULMAN, respectfully requests this Honorable Court impose a sentence of 37 months in the Bureau of Prisons with a recommendation that the defendant be permitted to participate in any available and appropriate drug treatment program(s), recommend the Bureau of Prisons place the defendant in the Federal Reformatory for Women in  Alderson, West Virginia, allow her voluntarily surrender to the designated facility and modify the terms and conditions of bond pending her voluntary surrender to allow her to reside in the marital home pending her designation and surrender.

Respectfully submitted,

S/Sanford A. Schulman
SANFORD A. SCHULMAN P-43230
SCHULMAN & ASSOCIATES, P.C.
Attorney for Defendant: AMERA A. AKL
500 Griswold Street, Suite 2340
Detroit, Michigan 48226
(313) 963-4740
Email: saschulman@comcast.net

Date:  June 20, 2011

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

UNITED STATES OF AMERICA,

          Plaintiff,

                    Case No. 10CR252
                    Hon. JAMES G. CAR
vs.                  Magistrate Judge VERNELIS K. ARMSTRONG

AMERA A. AKL,

          Defendant.

_____/

DUNCAN T. BROWN              JUSTIN E. HERDMAN
Assistant US Attorney        Assistant US Attorney
801 Superior Avenue, W.      801 Superior Avenue, W.
Ste. 400                      Ste. 400
Cleveland, OH 44113         Cleveland, OH 44113
(216) 622-3933              (216) 622-3965
Fax: (216) 685-2378        Fax: (216) 685-2378
Email: Duncan.brown@usdoj.gov  Email: justin.herdman@usdoj.gov

THOMAS E. GETZ
Assistant US Attorney
801 Superior Avenue, W. Ste. 400
Cleveland, OH 44113
(216) 622-3840
Fax: (216) 685-2378
Email: Thomas.Getz@usdoj.gov

SANFORD A. SCHULMAN
Attorney for Defendant: AMERA A. AKL
500 Griswold Street, Suite 2340
Detroit, Michigan 48226
(313) 963-4740
Fax: (248) 671-0353
Email: saschulman@comcast.net

_____/

42

## <u>CERTIFICATE OF ELECTRONIC FILING WITH COURT</u>

SANFORD A. SCHULMAN, affirms, deposes and states that on the 20th

day of June, 2011, he did cause to be served electronically with the Clerk of United

States District Court, Northern District of Ohio, Western District, using ECF system

which will send notification of such filing to the following:

Hon. JAMES G. CAR
JUSTIN E. HERDMAN
    Assistant US Attorney
DUNCAN T. BROWN
    Assistant US Attorney
THOMAS E. GETZ
    Assistant US Attorney

the following pleadings:

1. DEFENDANT, AMERA A. AKL'S SENTENCING MEMORANDUM;
2. Certificate of Electronic Filing.


Respectfully submitted,


s/Sanford A. Schulman P-43230
-------------------------------------------
SANFORD A. SCHULMAN P-43230
Attorney for Defendant AMERA AKL
500 Griswold Street, Suite 2340
Detroit, Michigan 48226
saschulman@comcast.net
(313) 963-4740

43